MULFORD et al. v. SMITH et al. (UNITED STATES, Intervener).

No. 97.

District Court, M. D. Georgia, Valdosta Division.

Oct. 7, 1938.

A. J. Little, of Valdosta, Ga., for plaintiffs.

Franklin & Eberhardt (O. W. Franklin and H. C. Eberhardt), of Valdosta, Ga., for original defendants.

John S. L. Yost, Sp. Asst. to Atty. Gen., and T. Hoyt Davis, U. S. Dist. Atty., of Macon, Ga., for the United States.

Before SIBLEY, Circuit Judge, and DEAVER and KENNAMER, District Judges.

SIBLEY, Circuit Judge.

Some of the reasons supporting the foregoing Conclusions of Law may profitably be stated.

It is mainly urged for plaintiffs that the part of the Act in controversy is not a regulation of interstate and foreign commerce but is a regulation of all sales of tobacco by producers, whether for export from the State or for manufacture and consumption within the State, and whether large or small; and that the real purpose and effect of it is to regulate and restrict the production of tobacco, which is a local activity. We may concede that agriculture, mining, manufacture and the like are in themselves local activities, the regulation of which generally belongs to the States and not to Congress. So are sales made within the State not intended at the time to result in removing the goods from the State. But it may not be maintained that such intrinsically local matters do not under some circumstances become so interwoven with interstate and foreign commerce as to render it necessary and proper for Congress to affect or control them in order to regulate the interstate and foreign commerce which springs from them. The power of Congress to regulate such commerce is paramount and is very broad. If regulation of any kind is needed, the Congress and not the States must furnish it; and it may be of any kind not prohibited by other constitutional provisions. A State prior to the Union would so have regulated by virtue of its general police power. After the Union, this sphere of the police power vests in the Congress. Within its sphere, the power of Congress is in its nature a police power, to be exerted for the public good and in any way, not prohibited, which Congress deems calculated to achieve the desired regulatory effect. This may involve, as above stated, the affecting or controlling what would usually pertain to the State police power. Thus, intra-state rates may be controlled by Congress when so involved with interstate commerce as to make it necessary. Possession of intoxicating liquor under prohibition was controlled by Congress though its constitutional power extended only to the manufacture, transportation and sale thereof. Very extensive regulation of the production of distilled liquors has always been allowed to secure payment of the federal taxes on the liquors, though such production would otherwise be only of State concern. But the law in controversy does not directly regulate the production of tobacco. It does not penalize or forbid the production of any amount the grower pleases. He may do what he likes with it except to market it. Since most tobacco is grown only to be sold, the inability to sell the excess of a quota except at a loss at least of all profit would tend to and probably would result in the non-production of the excess so far as the grower can prevent it. But the Act directly deals only with the marketing, and not with the planting or production of tobacco.

Since marketing is an act of commerce, like transportation, if marketing in interstate and foreign commerce alone had been regulated, there would be no fair doubt of the power of Congress generally to regulate. The trouble arises from the inclusion of all sales of tobacco by producers. Congress rests that inclusion on its right to regulate not particular sales as such, but the commerce in tobacco as a great whole, because it is overwhelmingly a matter of interstate and foreign traffic, and so unified in fact as that it must be dealt with generally and on a nationwide scale. The price to producers, the stability of which is asserted by Congress to be a main concern both because the support of hundreds of thousands of persons depends on it, and because it in turn controls the amount of tobacco which will be grown and if too low may destroy the industry altogether, is a countrywide matter.

No State acting alone could wisely or effectively regulate the situation. Conflict and reprisals would almost certainly follow State effort. In Georgia all tobacco, except a negligible amount, is sold for export from the State, and this is predominantly true in all the States which produce tobacco. The commerce in it is in fact overwhelmingly interstate and foreign. The stable supply to meet the stable demand and to result in a stable price which Congress seeks to achieve can in its judgment practically be reached only by a countrywide regulation controlling the entire market. Courts may not overrule the considered judgment of Congress on the point, where the conclusion is not clearly irrational and arbitrary. They must enforce the law without questioning its wisdom or effectiveness. Should Congress, (except in a case of clear usurpation), seek unjustifiably to control matters which ought to remain with the States the issue becomes so far political that solution might better be had in the elections as of a public question between the States and the Union than in the courts at the instance of private litigants.

▮ The Act is not a price-fixing one. The price is still fixed by the will of buyer and seller, and more remotely by the circumstances that normally affect prices. It seeks merely to stabilize one of those circumstances, to-wit, the available marketable supply for the year. Protective tariffs affect prices similarly. It does not take the property of any producer. It affects the value of his excess, if intentionally or unintentionally he makes more tobacco than his quota, for he has to hold it for another quota year, or else use it in some other way. In so far as it takes his *liberty* of selling what is his own for what he can obtain for it, or indirectly affects his *liberty* to plant what he pleases on his own land, the taking is not without due process of law but is the ordinary restraint of liberty which accompanies every exercise of police power for the public good. One may be prohibited by competent authority from raising or selling tobacco if by so doing he injures others. Sec utere tuo ut alienum non laedas, a nounless maxim, qualifies both the property and the liberties of everyone.

▮ This particular Act does not fail for vagueness in the standards for fixing quotas, nor leave everything to the Secretary so as to make him legislator. The language of Sect. 313(b), 7 U.S.C.A. § 1313(b), refers to farm quotas, and in speaking of "past marketing of tobacco" means the marketing from each several farm, and so in reference to considering "land, labor, and equipment available for the production of tobacco" reference is made to each farm. These are the things that one would naturally consider in fixing fair quotas for individual farms, and they furnish a sufficient legislative guide, and they were satisfactorily applied to these plaintiffs.

▮ The application of a quota in 1938 after crop preparations had begun may entail some hardship and loss but does not deprive of property without due process of law. When the Act was passed in February, preparation had not proceeded far. Even in March when the referendum made it certain there would be a quota, it was not too late to plant some of the tobacco land in other crops, at a loss only of some of the young plants. The Act does not penalize one for having prepared too much land or having started too many young plants, but only for selling too much tobacco months afterward. Had the quotas been fixed in December, as hereafter they will be, many producers would have produced an excess anyhow, the season having been unusually favorable. That chance always must exist. If the conduct to be penalized has not happened and may be avoided when the penal law is passed, there is no constitutional transgression although some preparation may have been made to do it. Witness the fate of liquor stocks when laws prohibiting their sale were passed. The excess tobacco, it is argued, would spoil if kept unless further treated, and plaintiffs had no facilities for treating it. But all that is sold is thus treated by the purchasers. The growers, foreseeing excesses, could have arranged to have their unsalable tobacco processed, either by shipping it elsewhere or by converting a warehouse into a processing plant. At any rate, it was their burden.

The penalties incurred by wilful sales this year of excess tobacco must be paid.

SIBLEY, Circuit Judge, and CHARLES B. KENNAMER, District Judge:

This cause came on for final hearing upon an agreed statement of facts before a Court composed of Honorable Samuel H. SIBLEY, United States Circuit Judge, Honorable Bascom S. DEAVER and Hon-

924

orable Charles B. KENNAMER, District Judges, and was argued by counsel, and decision reserved. The Court being now fully advised in pursuance of Findings of Fact and Conclusions of Law filed herewith, it is considered and decreed by the Court:

1. That Sections 312, 313 and 314 of the Agricultural Adjustment Act of 1938, 7 U.S.C.A. §§ 1312–1314, exhibited in the petition, are constitutional and valid as against the attacks made by the Plaintiffs thereon.

2. That the application of the Act to the marketing season of 1938 is not unconstitutional, but the quotas fixed thereunder for the marketing of plaintiffs' tobacco are valid and binding, and marketing by them of tobacco in excess of such quotas may validly be penalized according to the Act.

3. The injunction prayed for is denied, and the restraining order heretofore granted is dissolved. The funds in the hands of the Clerk are to be returned to the parties who paid them in, for disposition according to law. Should any dispute arise touching said fund, jurisdiction is reserved to hear and determine it.

4. The bill is dismissed, and costs are adjudged against the plaintiffs in favor of the defendants, to be taxed by the Clerk.

CHARLES B. KENNAMER, District Judge:

On the Bill of Complaint and the Stipulation of Facts, made by the Complainants and the Defendants, I believe the decree I am signing is proper.

I concur in the results reached by Judge SIBLEY, but not entirely in the reasoning or opinion.