## MULFORD et al. v. SMITH et al.

No. 505. Argued March 8, 1939.—Decided April 17, 1939.

40

*Mr. A. J. Little,* with whom *Messrs. C. A. Avriett* and *L. E. Heath* were on the brief, for appellants.

*Solicitor General Jackson* and *Mr. Robert K. McConnaughey,* with whom *Assistant Attorney General Arnold,* and *Messrs. Hugh B. Cox, Robert L. Stern, John S. L. Yost, Mastin G. White, Robert H. Shields,* and *W. Carroll Hunter* were on the brief, for the United States (intervening defendant), appellee.

*Mr. Omer W. Franklin* for Smith et al., appellees.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The appellants, producers of flue-cured tobacco, assert that the Agricultural Adjustment Act of 1938,[1] is unconstitutional as it affects their 1938 crop.

The portions of the statute involved are those included in Title III, providing marketing quotas for flue-cured tobacco.[2] The Act directs that when the supply is found to exceed the level defined in the Act as the "reserve supply level" a national marketing quota shall become effective which will permit enough flue-cured tobacco to be marketed during the ensuing marketing year to maintain the supply at the reserve supply level. The quota is to be apportioned to the farms on which tobacco is grown. Penalties are to be paid by tobacco auction warehousemen for marketing tobacco from a farm in excess of its quota.

---

[1] 52 Stat. 31, as amended March 26, 1938, 52 Stat. 120, April 7, 1938, 52 Stat. 202, May 31, 1938, 52 Stat. 586, and June 20, 1938, 52 Stat. 775; U. S. C. Supp. IV, Title 7, §§ 1281, *et seq.*

[2] Title III, Subtitle B, Marketing Quotas, Part I, marketing quotas—tobacco, §§ 311–314, inclusive. See also § 301, Definitions. §§ 361–375, inclusive, administrative provisions; §§ 388 and 389 relating to personnel.

Section 311 is a finding by the Congress that the marketing of tobacco is a basic industry which directly affects interstate and foreign commerce; that stable conditions in such marketing are necessary to the general welfare; that tobacco is sold on a national market and it and its products move almost wholly in interstate and foreign commerce; that without federal assistance the farmers are unable to bring about orderly marketing, with the consequence that abnormally excessive supplies are produced and dumped indiscriminately on the national market; that this disorderly marketing of excess supply burdens and obstructs interstate and foreign commerce, causes reduction in prices and consequent injury to commerce, creates disparity between the prices of tobacco in interstate and foreign commerce and the prices of industrial products in such commerce, and diminishes the volume of interstate commerce in industrial products; and that the establishment of quotas as provided by the Act is necessary and appropriate to promote, foster and obtain an orderly flow of tobacco in interstate and foreign commerce.

There is no provision for continuous regulation of tobacco marketing, but, by § 312 (a), regulation becomes effective in any year only if, on November 15th, the Secretary finds that the total supply of tobacco as of July 1st exceeded the reserve supply level which is defined in the Act.[3] If he so finds, he shall, by December 1st, proclaim the total supply and a national marketing quota shall be in effect throughout the marketing year which commences the following July 1st. The quota is to be the amount which the Secretary finds will make available during the ensuing marketing year a supply of tobacco equal to the

---

[3] The total supply, the carry-over for a marketing year, the reserve supply level, the normal supply, a normal year's domestic consumption, and a normal year's exports, are defined in § 301.

reserve supply level. As it was not passed until after November 15, 1937, the Act provided, with respect to the marketing year beginning July 1, 1938, for which the quotas involved in this case were in effect, that the determination and proclamation of the national marketing quota should be made within fifteen days after the statute's approval.[4]

Within thirty days after proclamation, the Secretary is to conduct a referendum of the producers of the crop of the preceding year to ascertain whether they favor or oppose the imposition of a quota. If more than one-third oppose, the Secretary is to proclaim the result before January 1st and the quota is not to be effective.[5]

By § 313 (a) it is directed that the quota is to be first apportioned among the states based on the total quantity of tobacco produced in each state during the five years immediately preceding the year in question, plus the normal production of any acreage diverted under any agricultural adjustment and conservation program in any of the years. The basic determination is to be adjusted to correct state allotments, giving due consideration to seed bed or other plant diseases, production trends, or abnormal producing conditions which affected production in the several states during the five-year period, and to make required provision for allotments to small farms. A limit is set below which the quota of any state may not be reduced.

The Act provides for the apportionment of the state allotment amongst the farms which produced tobacco in the current year or have produced previously in one or more of the four preceding years. Apportionment to

---

[4] § 312 (d).

[5] § 312 (c). With respect to 1938 quotas, the proclamation of the result of the referendum was to be made within forty-five days after approval of the Act. § 312 (d).

these farms is to be made on the basis of past marketing, after due allowance for drought, flood, hail, and other abnormal weather conditions, plant bed and other diseases, land, labor, and equipment available for the production of tobacco, crop-rotation practices, and soil and other physical factors affecting production. A limit is fixed below which the adjustment may not reduce the production of a given farm. Allotment to new tobacco farms is to be made on a slightly different basis.[6]

Apportionment of the quota amongst individual farms is to be by local committees of farmers according to standards prescribed in the Act, amplified by regulations and instructions issued by the Secretary. Each farmer is to be notified of his marketing quota and the quotas of individual farms are to be kept available for public inspection in the county or district where the farm is located. If the farmer is dissatisfied with his allotment he may have his quota reviewed by a local review committee, and, if dissatisfied with the determination of that committee, he may obtain judicial review.

Section 314 provides that if tobacco in excess of the quota for the farm on which the tobacco is produced is marketed through a warehouseman, the latter must pay to the Secretary a penalty equal to fifty per cent. of the market price of the excess, and may deduct an amount equivalent to the penalty from the price paid the producer.[7]

---

[6] §§ 313 (b) and 313 (c).

[7] If the tobacco is marketed directly to a person outside the United States, the producer is required to pay the penalty. If the tobacco is sold by the grower directly to a purchaser without intervention by the warehouseman or other agent, the buyer is required to pay the penalty, but may deduct an equivalent amount from the purchase price. §§ 314, 372, 373. The penalty is to be three cents per pound if that rate is higher than 50% of the market price. § 314.

Section 376 gives the United States a civil action for the recovery of unpaid penalties.[8]

A few days before the 1938 auction sales were to take place, the appellants, who produce flue-cured tobacco in southern Georgia and northern Florida, filed a bill in equity in a Georgia state court against local warehousemen to restrain them from deducting penalties under the Act from the sales price of tobacco to be sold at their auction warehouses on behalf of appellants. The bill alleged that the Act is unconstitutional; that it illegally commands the defendants to deduct penalties, pay them over to the Secretary, who must cover them into the treasury of the United States; that, if the defendants should make the required payments, the amounts paid by them would aggregate so large a sum that they would be unable to satisfy judgments in actions brought to recover the illegal payments. The court granted a preliminary injunction and ordered the defendant warehousemen to pay the amounts of the penalties into the registry of the court. The cause was removed to the United States District Court for the Middle District of Georgia. The District Court continued the injunction, modified the order to require the payments to be made into its registry, the auction sales were held, and payments into the court were made. The United States was permitted to intervene as a defendant.[9] The warehousemen and the United States filed answers. The cause was set down before a court

[8] The Secretary may make regulations necessary for identifying tobacco subject to quotas, § 375; and requiring the keeping of records and the making of reports. The Act imposes upon handlers other than producers a fine of $500 upon conviction of failure to make any report or keep any record, or for making any false report or record. § 373 (a) and (b).

[9] Act of August 24, 1937, c. 754, § 1, 50 Stat. 751; U. S. C. Supp. III, Tit. 28, § 401.

consisting of three judges,[10] which heard it on a stipulation of facts and entered a decree dismissing the bill.[11]

Before coming to the merits we inquire whether the court below had jurisdiction as a federal court or as a court of equity. Though no diversity of citizenship is alleged, nor is any amount in controversy asserted so as to confer jurisdiction under subsection (1)[12] of § 24 of the Judicial Code, the case falls within subsection (8)[13] which confers jurisdiction upon District Courts "of all suits and proceedings arising under any law regulating commerce." Maintenance of the bill for injunction is not forbidden by R. S. 3224,[14] which applies only to a suit to restrain assessment or collection of a tax. Under the averments of the bill the defendant warehousemen would be wrongdoers if they deducted and paid over the prescribed penalties, but no action at law would be adequate to redress the damage thus inflicted. It appears that the total of the penalties involved in this suit is some $374,000. The allegation that the warehousemen would be unable to respond in actions for sums aggregating this amount has, therefore, reasonable basis. Before any such action could be initiated the penal sum would have been paid to the Secretary of Agriculture and by him to the Treasurer of the United States and covered into the general funds of the Treasury. No action could be maintained against the warehousemen or either of these officials for disposing of the penal sums in accordance with the terms of the Act unless prior notice not to do so had been served upon each of them. In the light of the fact that the appellants received notice of their quotas only a few days before the

[10] *Ibid,* U. S. C. Supp. III, Tit. 28, § 380 (a).
[11] 24 F. Supp. 919.
[12] U. S. C. Tit. 28, § 41 (1).
[13] U. S. C. Tit. 28, § 41 (8).
[14] U. S. C. Tit. 26, § 1543.

actual marketing season opened, the maintenance of actions based upon collection of the penalties would have been a practical impossibility. We are of opinion, therefore, that a case is stated for the interposition of a court of equity.

The appellants plant themselves upon three propositions: (1) that the Act is a statutory plan to control agricultural production and, therefore, beyond the powers delegated to Congress; (2) that the standard for calculating farm quotas is uncertain, vague, and indefinite, resulting in an unconstitutional delegation of legislative power to the Secretary; (3) that, as applied to appellants' 1938 crop, the Act takes their property without due process of law.

*First.* The statute does not purport to control production. It sets no limit upon the acreage which may be planted or produced and imposes no penalty for the planting and producing of tobacco in excess of the marketing quota. It purports to be solely a regulation of interstate commerce, which it reaches and affects at the throat where tobacco enters the stream of commerce,—the marketing warehouse.[15] The record discloses that at least two-thirds of all flue-cured tobacco sold at auction warehouses is sold for immediate shipment to an interstate or foreign destination. In Georgia nearly one hundred per cent. of the tobacco so sold is purchased by extrastate purchasers. In markets where tobacco is sold to both interstate and intrastate purchasers it is not known, when the grower places his tobacco on the warehouse floor for sale, whether it is destined for interstate or intrastate commerce. Regulation to be effective, must, and therefore may constitutionally, apply to all sales.[16] This

---

[15] *Currin* v. *Wallace,* 306 U. S. 1; compare *Townsend* v. *Yeomans,* 301 U. S. 441.

[16] *The Minnesota Rate Cases,* 230 U. S. 352; *The Shreveport Case,* 234 U. S. 342; *Currin* v. *Wallace, supra.*

48

court has recently declared that sales of tobacco by growers through warehousemen to purchasers for removal outside the state constitute interstate commerce.[17] Any rule, such as that embodied in the Act, which is intended to foster, protect and conserve that commerce, or to prevent the flow of commerce from working harm to the people of the nation, is within the competence of Congress. Within these limits the exercise of the power, the grant being unlimited in its terms, may lawfully extend to the absolute prohibition of such commerce,[18] and *a fortiori* to limitation of the amount of a given commodity which may be transported in such commerce. The motive of Congress in exerting the power is irrelevant to the validity of the legislation.[19]

The provisions of the Act under review constitute a regulation of interstate and foreign commerce within the competency of Congress under the power delegated to it by the Constitution.

*Second.* The appellants urge that the standard for allotting farm quotas is so uncertain, vague, and indefinite that it amounts to a delegation of legislative power to an executive officer and thus violates the Constitutional requirement that laws shall be enacted by the Congress.

What has been said in summarizing the provisions of the Act sufficiently discloses that definite standards are laid down for the government of the Secretary, first, in fixing the quota and, second, in its allotment amongst states and farms. He is directed to adjust the allot-

[17] *Currin* v. *Wallace, supra;* and see *Dahnke-Walker Co.* v. *Bondurant,* 257 U. S. 282, 290; *Shafer* v. *Farmers Grain Co.,* 268 U. S. 189, 198. Compare *Lemke* v. *Farmers Grain Co.,* 258 U. S. 50.

[18] *Champion* v. *Ames,* 188 U. S. 321; *Hipolite Egg Co.* v. *United States,* 220 U. S. 45; *Hoke* v. *United States,* 227 U. S. 308; *Brooks* v. *United States,* 267 U. S. 432; *Gooch* v. *United States,* 297 U. S. 124.

[19] Story, Commentaries on the Constitution (4th Ed.), §§ 965, 1079, 1081, 1089.

ments so as to allow for specified factors which have abnormally affected the production of the state or the farm in question in the test years. Certainly fairness requires that some such adjustment shall be made. The Congress has indicated in detail the considerations which are to be held in view in making these adjustments; and, in order to protect against arbitrary action, has afforded both administrative and judicial review to correct errors. This is not to confer unrestrained arbitrary power on an executive officer. In this aspect the Act is valid within the decisions of this court respecting delegation to administrative officers.[20]

*Third.* In support of their contention that the Act, as applied to the crop year 1938, deprives them of their property without due process of law in violation of the Fifth Amendment, the appellants rely on the following undisputed facts.

Tobacco growers in southern Georgia and northern Florida began to arrange for the planting of their 1938 crop in December, 1937, when it was necessary for them to prepare beds for the planting of the seeds. Thereafter it was necessary to cultivate the seed beds, sow and water the seed, cover the beds with cloth, and otherwise care for the plants until they were large enough to be transplanted. At the date of approval of the Act each of the plaintiffs had planted his seed beds and, about the middle of March, began transplanting into the fields, which were prepared and fertilized at large expense. The plants were thereafter cultivated and sprayed, and harvesting began during June and continued during July, followed by the curing and grading of the tobacco.

---

[20] *United States* v. *Grimaud*, 220 U. S. 506; *Avent* v. *United States*, 266 U. S. 127; *Hampton & Co.* v. *United States*, 276 U. S. 394; *New York Central Securities Corp.* v. *United States*, 287 U. S. 12; *Currin* v. *Wallace, supra.*

All of these activities involved labor and expense. The production of flue-cured tobacco requires, at prevailing price levels, a cash outlay of between thirty and forty dollars per acre for fertilizer, plant bed covering, twine, poison, etc. The use of animals and permanent and semi-permanent equipment demands an average expenditure, over a period of years, ranging from twenty to thirty dollars an acre. The labor expended per acre is between three hundred and four hundred man-hours. The total cost per pound varies from ten cents to twenty cents.

The marketing season for flue-cured tobacco in Georgia and Florida commences about August 1st of each year. Each of the appellants was notified of the quota of his farm shortly before the opening of the auction markets. Prior to the receipt of notice each of them had largely, if not wholly, completed planting, cultivating, harvesting, curing and grading his tobacco. Until receipt of notice none knew, or could have known, the exact amount of his quota, although, at the time of filing the bill, each had concluded from available information that he would probably market tobacco in excess of any quota for his farm.

The Act was approved February 16, 1938. The Secretary proclaimed a quota for flue-cured tobacco on February 18th and, on the same date, issued instructions for holding a referendum on March 12th. March 25th the Secretary proclaimed the result of the referendum which was favorable to the imposition of a national marketing quota. In June he issued regulations governing the fixing of farm quotas within the states. July 22nd he determined the apportionment as between states and issued regulations relative to the records to be kept by warehousemen and others. Shortly before the markets opened each appellant received notice of the allotment to his farm.

On the basis of these facts it is argued that the statute operated retroactively and therefore amounted to a taking of appellants' property without due process. The argument overlooks the circumstance that the statute operates not on farm production, as the appellants insist, but upon the marketing of their tobacco in interstate commerce. The law, enacted in February, affected the marketing which was to take place about August 1st following, and so was prospective in its operation upon the activity it regulated. The Act did not prevent any producer from holding over the excess tobacco produced, or processing and storing it for sale in a later year; and the circumstance that the producers in Georgia and Florida had not provided facilities for these purposes is not of legal significance.

The decree is

*Affirmed.*

Mr. Justice Butler, dissenting.

Plaintiffs are farmers in Georgia and on their farms raise tobacco. They sell it in the market year when produced because, in their circumstances, they are unable to process and make it fit to be held for sale in a later year. The sales are at auction markets, through defendants who are Georgia warehousemen, to purchasers intending to take the tobacco outside the State. The Secretary of Agriculture, assuming to be empowered by the Agricultural Adjustment Act of 1938, undertook to prescribe the amount of flue-cured tobacco to be raised in 1938 in the United States, in each State, and on each farm. He failed to let plaintiffs know the quotas respectively assigned to them until after their crops had matured and were ready for marketing. Each raised more than the assigned quota.

The Act declares that, if more than the amount fixed for a farm is marketed, the warehouseman shall pay to

the Secretary a penalty equal to one-half the price of the excess, but it authorizes him to retain that amount from the farmer raising and bringing it to market for sale. If, without resort to a warehouseman, the farmer sells directly to one in this country, the purchaser is required to pay the penalty but is authorized to take the amount from the purchase price. If the farmer sells directly to one outside the United States he is required to pay the penalty to the Secretary. Thus, in any event, the penalty is effectively laid upon the farmer. Enforcement of the Act will compulsorily take from plaintiffs an amount of money equal to one-half of the market value of all tobacco raised and sold by them in excess of the prescribed quotas.

In *United States* v. *Butler,* 297 U. S. 1, we held the federal government without power to control farm production. We condemned the statutory plan there sought to be enforced as repugnant to the Tenth Amendment. That scheme was devised and put in effect under the guise of exertion of power to tax. We held it to be in excess of the powers delegated to the federal government; found the tax, the appropriation of the money raised, and the directions for its disbursement, to be but the means to an unconstitutional end; showed that the Constitution confers no power to regulate production and that therefore legislation for that purpose is forbidden; emphasized the principle established by earlier decisions that a prohibited end may not be attained under pretext of exertion of powers which are granted; and finally we declared that, if Congress may use its power to tax and to spend compulsorily to regulate subjects within the reserved power of the States, that power "would become the instrument for total subversion of the governmental powers reserved to the individual States."

After failure of that measure, Congress, assuming power under the commerce clause, enacted the provisions authorizing the quotas and penalties the validity of which is questioned in this case. Plaintiffs contend that the Act is a plan to control agricultural production and therefore beyond the powers delegated to Congress. The Court impliedly concedes that such a plan would be beyond congressional power, but says that the provisions do not purport to control production, set no limit upon the acreage which may be planted or produced and impose no penalty upon planting and production in excess of marketing quota. Mere inspection of the statute and Secretary's regulations unmistakably discloses purpose to raise price by lessening production. Whatever may be its declared policy or appearance, the enactment operates to control quantity raised by each farmer. It is wholly fallacious to say that the penalty is not imposed upon production. The farmer raises tobacco only for sale. Punishment for selling is the exact equivalent of punishment for raising the tobacco. The Act is therefore invalid. *United States* v. *Butler,* 297 U. S. 1. *Hammer* v. *Dagenhart,* 247 U. S. 251. See *Brooks* v. *United States,* 267 U. S. 432, 438; *Kentucky Whip & Collar Co.* v. *Illinois Central R. Co.,* 299 U. S. 334, 350. Cf. *Retirement Board* v. *Alton R. Co.,* 295 U. S. 330, 362, *et seq.*

Assuming that, under *Currin* v. *Wallace,* 306 U. S. 1, plaintiffs' sales in interstate commerce at defendants' auction markets are to be deemed subject to federal power under the commerce clause, the Court now rules that, within suggested limits so vague as to be unascertainable, the exercise of power under that clause, "the grant being unlimited in its terms, may lawfully extend to the absolute prohibition of such commerce and *a fortiori* to limitation of the amount of a given commodity which may be transported in such commerce."

That ruling is contrary alike to reason and precedent. To support it, the Court merely cites the following cases:

The Lottery Case, (*Champion* v. *Ames*) 188 U. S. 321, held that an Act of Congress prohibiting transportation of lottery tickets in interstate commerce is not inconsistent with any limitation or restriction imposed upon exercise of the powers granted to Congress. After demonstrating the illicit character of lottery tickets, the Court said (p. 357): "We should hesitate long before adjudging that an evil of such appalling character, carried on through interstate commerce, cannot be met and crushed by the only power competent to that end. . . . [p. 358] It is a kind of traffic which no one can be entitled to pursue as of right."

*Hipolite Egg Co.* v. *United States*, 220 U. S. 45, held within federal power the provisions of the Food and Drug Act forbidding transportation in interstate commerce of food "debased by adulteration" and authorizing articles so transported to be seized as contraband.

*Hoke* v. *United States*, 227 U. S. 308, sustained congressional prohibition of interstate transportation of women for immoral purposes.

*Brooks* v. *United States*, 267 U. S. 432, upheld a statute of the United States making it a crime to transport a stolen automobile in interstate commerce.

*Gooch* v. *United States*, 297 U. S. 124, construed an Act of Congress making it a crime to transport a kidnapped person in interstate commerce.

Plainly these cases give no support to the view that Congress has power generally to prohibit or limit, as it may choose, transportation in interstate commerce of corn, cotton, rice, tobacco, or wheat. Our decisions establish the contrary:

*Wilson* v. *New*, 243 U. S. 332, upheld an Act regulating hours of service of employees of interstate carriers

by rail. The Court, following the teaching of earlier decisions, said (p. 346): "The extent of regulation depends on the nature and character of the subject and what is appropriate to its regulation. The powers possessed by government to deal with a subject are neither inordinately enlarged or greatly dwarfed because the power to regulate interstate commerce applies. This is illustrated by the difference between the much greater power of regulation which may be exerted as to liquor and that which may be exercised as to flour, drygoods and other commodities. It is shown by the settled doctrine sustaining the right by regulation absolutely to prohibit lottery tickets and by the obvious consideration that such right to prohibit could not be applied to pig iron, steel rails, or most of the vast body of commodities."

*Hammer* v. *Dagenhart*, 247 U. S. 251, held repugnant to the commerce clause and to the Tenth Amendment an Act prohibiting transportation in interstate commerce of articles made at factories in which child labor was employed. The Court said (p. 269): "In other words, the power [granted by the commerce clause] is one to control the means by which commerce is carried on, which is directly the contrary of the assumed right to forbid commerce from moving and thus destroy it as to particular commodities. But it is insisted that the adjudged cases in this court establish the doctrine that the power to regulate given to Congress incidentally includes the authority to prohibit the movement of ordinary commodities and therefore that the subject is not open for discussion. The cases demonstrate the contrary. They rest upon the character of the particular subjects dealt with and the fact that the scope of governmental authority, state or national, possessed over them is such that the authority to prohibit is as to them but the exertion of the power to regulate. . . . [p. 276] In our view the necessary effect of this act is, by means of a prohibition

against the movement in interstate commerce of ordinary commercial commodities, to regulate the hours of labor of children in factories and mines within the States, a purely state authority. Thus the act in a twofold sense is repugnant to the Constitution. It not only transcends the authority delegated to Congress over commerce but also exerts a power as to a purely local matter to which the federal authority does not extend. The far reaching result of upholding the act cannot be more plainly indicated than by pointing out that if Congress can thus regulate matters entrusted to local authority by prohibition of the movement of commodities in interstate commerce, all freedom of commerce will be at an end, and the power of the States over local matters may be eliminated, and thus our system of government be practically destroyed."

Heretofore, in cases involving the power of Congress to forbid or condition transportation in interstate commerce, this Court has been careful to determine whether, in view of the nature and character of the subject, the measure could be sustained as an appropriate regulation of commerce.* If Congress had the absolute power now attributed to it by the decision just announced, the opinions in these cases were unnecessary and utterly beside the mark.

For reasons above suggested, I am of opinion:

The penalty is laid on the farmer to prevent production in excess of his quota. It is therefore invalid.

---

*Lottery Case, 188 U. S. 321, 355 et seq. United States v. Delaware & Hudson Co., 213 U. S. 366, 415. Hipolite Egg Co. v. United States, 220 U. S. 45, 57–58. Hoke v. United States, 227 U. S. 308, 321–323. Seven Cases v. United States, 239 U. S. 510, 514. Caminetti v. United States, 242 U. S. 470, 491–492. Hammer v. Dagenhart, 247 U. S. 251, 270 et seq. Brooks v. United States, 267 U. S. 432, 436–438. See Wilson v. New, 243 U. S. 332, 346. Cf. Clark Distilling Co. v. Western Md. Ry. Co., 242 U. S. 311, 325. United States v. Hill, 248 U. S. 420. Kentucky Whip & Collar Co. v. Illinois Central R. Co., 299 U. S. 334, 346 et seq.

If the penalty is imposed for marketing in interstate commerce, it is a regulation not authorized by the commerce clause.

To impose penalties for marketing in excess of quotas not disclosed before planting and cultivation is to deprive plaintiffs of their liberty and property without due process of law.

The judgment of the district court should be reversed.

MR. JUSTICE MCREYNOLDS concurs in this opinion.