## TROPPY v. LA SARA FARMERS GIN CO., Inc., et al. (UNITED STATES, Intervener).

### No. 18.

District Court, S. D. Texas, Brownsville Division.

Aug. 23, 1939.

Smith & Hall, of Edinburg, Tex., for plaintiff.

R. F. Robinson, of Raymondville, Tex., for La Sara Farmers Gin Co., Inc.

Sid L. Hardin, of Edinburg, Tex., for defendant Guerra Gin Co.

Douglas W. McGregor, U. S. Dist. Atty. of Houston, Tex., James L. Abney, Asst. U. S. Dist. Atty., of Brownsville, Tex., John S. L. Yost, Sp. Asst. to Atty. Gen., and W. Caroll Hunter, Atty., U. S. Department of Agriculture, of Washington, D. C., for the United States.

ALLRED, District Judge.

This suit attacks the constitutionality of the cotton marketing quota provisions (Part IV, subtitle B, title 3) of the Agricultural Adjustment Act of February 16, 1938, 52 Stat. 31, as amended, U.S.C., Title 7, § 1281 et seq., 7 U.S.C.A. § 1281 et seq., hereafter referred to as "the Act."

Plaintiff, a farmer and cotton grower residing in Willacy County, Texas (a part of the Rio Grande Valley), seeks to recover of the defendant gin companies a total of $356.26, being a 2¢ per pound penalty upon 17,813 pounds of cotton sold to the gin companies in excess of his farm marketing quota fixed by the United States Department of Agriculture, such penalty having been collected and withheld from plaintiff by the gin companies under Sec. 348, Part IV, of the Act, 7 U.S.C.A. § 1348.

The gin companies tendered the amount of penalties into Court and, under an appropriate order, the money was paid into the registry of this court pending final determination of the case.

Other defendants, constituting the county committee of Willacy County, Texas, charged with the administration of the Act, have been dismissed from the case.

The United States of America has intervened under the provisions of Section 1 of the Act of August 24, 1937, c. 754, § 1, 50 Stat. 751, 28 U.S.C., Supp. III, § 401, 28 U.S.C.A. § 401, for the purpose of defending the validity of the challenged provisions of the Act.

Plaintiff assails the constitutional validity of Part IV—the cotton marketing quota provisions—of the Act upon two grounds:

1. That it is not a regulation of *marketing*, but rather of the *agricultural production* of cotton over which Congress has no authority and which is reserved to the several states by the Tenth amendment to the United States Constitution;

2. That it is invalid as to plaintiff for the reason that the sales upon which the penalties were collected were not in interstate or foreign commerce but were purely local in character and did not have the direct or close and substantial effect on interstate and foreign commerce which must exist before Congress can regulate such sales.

As originally filed, this suit also attacked the cotton quota provisions of the Act, as constituting an unlawful delegation of authority by Congress to the Secretary of Agriculture; and as an unlawful delegation of legislative power by Congress to the cotton farmers; and as depriving him of his property without due process of law, in violation of the Fifth Amendment to the Constitution, U.S.C.A., in that plaintiff had planted his cotton before passage of the Act and same was practically matured before receipt of notice of marketing quotas for his farms.

These latter contentions have been abandoned, however, apparently in view of the decision of the United States Supreme Court upholding the constitutionality of Part 1, subtitle B, title 3, of the Act (7 U.S.C.A. § 1311 et seq.) dealing with marketing quotas for *tobacco*. Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. ——, decision dated April 17, 1939, affirming D.C., 24 F.Supp. 919.

Taking the position that there are substantial differences between the tobacco marketing quota provisions and the provisions of the Act dealing with cotton, plaintiff contends that Mulford v. Smith, supra, does not control this case; and earnestly presses the stated propositions, that is, that the cotton marketing quota provisions of the Act do not constitute a regulation of *marketing* but are plainly an effort to regulate *production;* and that the sales of cotton involved in this case are not interstate but purely local, not subject to regulation by Congress.

The Government, on the other hand, contends that there are no essential differences in the Act as to cotton and tobacco; and that this case is ruled by the decision of the United States Supreme Court in Mulford v. Smith, supra. This Court believes the Government is correct.

There is no controlling difference *in principle* between the *provisions* of the Act dealing with tobacco and cotton. Both contain legislative findings of fact by the Congress. Each authorizes and directs the Secretary of Agriculture to make certain findings as to supply and make proclamations thereof. Each authorizes and directs the Secretary to determine and fix *marketing quotas*. Each provides for a referendum of the producers involved.

The *only* difference, the *only* distinction between the tobacco and the cotton provisions is in the *method and system of marketing.*

Sec. 341 of the Act sets out legislative findings by the Congress, as to cotton, as follows:

"Sec. 341 [§ 1341]. American cotton is a basic source of clothing and industrial products used by every person in the United States and by substantial numbers of people in foreign countries. American cotton is sold on a world-wide market and moves from the places of production almost entirely in interstate and foreign commerce to processing establishments located throughout the world at places outside the State where the cotton is produced.

"Fluctuations in supplies of cotton and the marketing of excessive supplies of cotton in interstate and foreign commerce disrupt the orderly marketing of cotton in such commerce with consequent injury to and destruction of such commerce. Excessive supplies of cotton directly and materially affect the volume of cotton moving in interstate and foreign commerce and

cause disparity in prices of cotton and industrial products moving in interstate and foreign commerce with consequent diminution of the volume of such commerce in industrial products.

"The conditions affecting the production and marketing of cotton are such that, without Federal assistance, farmers, individually or in cooperation, cannot effectively prevent the recurrence of excessive supplies of cotton and fluctuations in supplies, cannot prevent indiscriminate dumping of excessive supplies on the Nationwide and foreign markets, cannot maintain normal carry-overs of cotton, and cannot provide for the orderly marketing of cotton in interstate and foreign commerce.

"It is in the interest of the general welfare that interstate and foreign commerce in cotton be protected from the burdens caused by the marketing of excessive supplies of cotton, in such commerce, that a supply of cotton be maintained which is adequate to meet domestic consumption and export requirements in years of drought, flood, and other adverse conditions as well as in years of plenty, and that the soil resources of the Nation be not wasted in the production of excessive supplies of cotton.

"The provisions of this Part affording a cooperative plan to cotton producers are necessary and appropriate to prevent the burdens on interstate and foreign commerce caused by the marketing in such commerce of excessive supplies, and to promote, foster, and maintain an orderly flow of an adequate supply of cotton in such commerce."

Sec. 342 directs the Secretary of Agriculture to make certain findings as to the supply of cotton and make proclamations thereof not later than ten days after the date of enactment of the Act. Sec. 343 authorizes and directs the Secretary to make full findings as to the amount of national allotment.

Sec. 344 authorizes and directs the apportionment of the national allotment. Secs. 345 and 346 authorizes and directs the Secretary of Agriculture to determine and fix the marketing quota and the amount of farm marketing quotas.

Sec. 347 provides for a referendum by secret ballot of farmers engaged in producing cotton.

Sec. 348 authorizes the penalties collected and herein sued for of 2¢ per pound for all cotton *marketed* in excess of the farm marketing quotas for the marketing year

for the farm on which the cotton was produced.

The facts have been stipulated and are undisputed. The stipulation is supported by various charts and statistical data. It is so voluminous that it will be impossible to set out a great deal of it in this opinion. Suffice to say that the facts amply justify the congressional findings appearing in Sec. 341.

The Secretary complied with Sections 342, 343, 344, 345, 346 and 347 of the Act. A marketing quota for the marketing year of 1938 was established for plaintiff's farms. No question is raised as to the fairness of the quotas or the methods employed by the Secretary in fixing the marketing quotas for plaintiff's farms.

The referendum of cotton farmers was held on March 12, 1938. 1,527,038 votes were cast, of which 92.1% were favorable to the national marketing quota and 7.9% were opposed thereto. Out of a total vote of 246,091 Texas cotton farmers, 217,425, or 88.4%, voted in favor of the national marketing quota.

For the marketing year beginning August 1, 1938, plaintiff marketed 17,813 pounds in excess of the quotas established for his farms. All his cotton, including the excess, was ginned by the defendant ginning companies, who shortly thereafter purchased such cotton from plaintiff and withheld from him the penalty of 2¢ per pound, amounting to a total of $356.26, now on deposit in the registry of this court.

Plaintiff's cotton was harvested during the month of July and the first two weeks of August, 1938. As it was picked, it was delivered to the defendant ginning companies for the purpose of ginning at such gins immediately upon delivery. The lint cotton was compressed into standard bales of approximately 500 pounds each. The bales were thereupon placed in the yards of the defendant ginners, subject to disposition to be made by the plaintiff.

The cotton was sold during the latter part of August, 1938, by the plaintiff to the defendant ginning companies, each of whom withheld, as required by the Act and regulations thereunder, the penalties involved herein.

Plaintiff's farms upon which this cotton was grown are located in the lower Rio Grande Valley, in the extreme southern tip of Texas. Numerous other crops are grown but cotton is the principal summer crop.

The larger part of the cotton produced in this area is sold direct by the grower to persons operating gins which gin the cotton. A few buyers not operating gins do a small percentage of buying from growers. After the sale by growers, usually from one to two or three additional sales are made before the ultimate destination of the cotton is determined, and before the journey which carries the cotton beyond the boundaries of the State begins, or the sale is made which vests title in an extra State purchaser. The sales and transactions occurring before the ultimate destination is determined and the sale made which is destined to carry the cotton beyond State lines, or vest title in an extra State purchaser are usually wholly within the State of Texas. After sale by growers, the bulk of the cotton is concentrated at port markets for merchandising for export trade or for domestic spinners mostly located outside of the State of Texas.

Practically all of the buyers aforesaid are engaged in business locally. They buy for their own benefit and resell to concerns from whom they can get the most money. None of these first buyers, as a rule, ship or sell outside the State.

That part of the cotton sold by plaintiff to defendant LaSara Farmers Gin Co., Inc., was disposed of by it during the period from July 25, 1938, to August 23, 1938, to Anderson Clayton & Company, cotton merchants, Esteve Bros. & Co., cotton merchants, Schulz Cotton Company, intermediate local buyer, Walthin and Ford, local buyer, and W. D. Sharp, local buyer who resold same to Anderson Clayton & Company. This cotton was shipped first to Harlingen, Texas, where it was unloaded, compressed and reshipped to the port of Corpus Christi, Texas. It was there unloaded and delivered to the purchasers, and that part of the cotton sold by plaintiff to Guerra Gin Company was resold by the gin company to N. A. Brown, a local buyer, during the first two weeks in August, 1938, and shipped to him at the Aransas Compress Company at Corpus Christi. Upon delivery at Corpus Christi Brown had same compressed and then sold and delivered it to Anderson Clayton & Co. in Corpus Christi.

The port of Corpus Christi, Texas, is an important concentration point for shipping cotton in interstate and foreign commerce. Of 328,088 bales of cotton received there, only 968 bales, or .3 of 1% is shipped to other Texas points. 4% is shipped to eight other states and the District of Columbia. 313,752 bales, or 95.7%, is shipped in foreign commerce to France, to Germany, Great Britain, Italy, the Orient, Spain and other foreign countries. Of the 4% shipped to other states in the Union a large portion goes to non-cotton producing states. The identity of the cotton is lost when shipped to markets and ports such as Corpus Christi.

Cotton is produced in 19 of the states of the Union. In many of these states, including Texas, it is the principal cash crop upon which the economic welfare of the inhabitants depends. On the 2,325,000 producer units, or farms, engaged in producing cotton in the south and southwest, there are not less than 11,500,000 people dependent on the cotton for the whole, or substantial part, of their income. Others dependent on ginning, compressing, selling and handling raw cotton and cotton seed number about 500,000; at least 3,000,000 are dependent on the manufacturing of cotton products, making a total of 15,000,000 people, or 11.5 of the total population of the United States as of July 31, 1938.

*"A poor cotton crop or a poor price for the crop stifles local, interstate, and foreign commerce in the whole cotton-producing area, adversely affecting millions of people, curtailing consumption in almost all kinds of products, including imported foreign-made goods, domestically manufactured goods, and agricultural products, and in a larger and less noticeable sense directly and adversely affects traffic in, and consumption of, goods throughout the entire United States."* (Stipulations, p. 27) (Italics supplied).

The total production of cotton in the producing states in 1937 was 18,233,000 bales, of which Texas produced 4,952,000 bales or 27.1%. Of this only 131,000 bales, or less than 3% of Texas production, were consumed within the State.

The consumption of cotton is known as mill consumption. Mills are located principally in the southeastern area (Alabama, Georgia, North Carolina, South Carolina and Virginia) and New England; and in many foreign countries.

As pointed out, Texas consumed less than 3% of its total production. Mississippi, producing 2,652,00 bales (14% of the whole), consumed less than 3%. Arkansas, producing 1,809,000 bales (9.9% of

the whole), consumed a negligible quantity, if any.

On the other hand, Alabama, producing 8.6% of the whole, consumed 55% of the amount of its production (1,567,000 bales) in 1937. Tennessee, producing 633,000 bales, consumed 30% of its production. California, producing 723,000 bales, consumed only 26,000 bales, or about 3½%. The consumption, if any, of the producing states of Arizona, Florida, Louisiana, Missouri, New Mexico and Oklahoma was too negligible for report. However, Georgia, North Carolina, South Carolina and Virginia (constituting part of the southeastern mill centers) each consumed more than was produced in their respective states.

Substantial quantities of cotton produced in these mill states were, however, shipped to points outside the state; and each also received substantial quantities of cotton produced in other states. On this basis alone about 75% of the cotton produced in the United States in 1937 moved in interstate and foreign commerce. Of all cotton moving outside the state of production, approximately 50% is shipped to foreign countries; and substantial quantities of this exported cotton moved in interstate commerce to ports of export for foreign commerce.

Domestic shipments are made in interstate commerce to mills in at least twenty states in which cotton is not produced. Cotton is also shipped to mills in each cotton producing state; and from each cotton producing state, in which a mill is located, to points outside the state.

The cotton producing states make direct and indirect shipments of cotton to and among themselves to non-producing states and to foreign countries. The indirect shipments are made through sea ports and interior markets.

Foreign shipments from the ports predominate over domestic shipments, while domestic shipments from interior markets predominate over foreign shipments.

The concentration of cotton at strategic points is due to many factors. Important mill centers are in the southeastern and New England states. There is considerable difference in the quality of cotton produced in the same and in different localities, and, in many instances, different qualities are used in different consuming centers. The requirements of mills are such that generally it is necessary to assemble stated quantities of uniform cotton of a much larger quantity possessing a wide quality range. The identity of the cotton as produced in any particular state is lost in the process of concentration for reshipment.

Movement of cotton varies somewhat with the several areas of production in the Cotton Belt. From the southwestern area, of which Texas is a part, the movement is largely to Texas ports for reshipment and, in smaller quantities, to many states, including the southeastern and New England mill centers, and to foreign countries. Reshipment from the ports is made to many states, including the mill centers, but principally to foreign countries.

The bales in which cotton is packed are frequently compressed at compress plants located throughout the producing areas. Much of the compression takes place at concentration points. All the cotton destined for transportation to foreign countries, and a substantial part of that shipped coastwise by water, is compressed. Usually cotton destined for points in the state of production is not compressed.

It is estimated that a bale of cotton produced in the United States travels on an average 4,000 miles from the farm to the mill.

The marketing channels through which all cotton passes are somewhat diverse. The marketing mechanism is largely determined by the geographic location between producing and consuming areas.

In some localities in the southeastern part of the United States, where the cotton produced is of a quality used by nearby mills, growers sell directly to manufacturers who may, or may not, be located in different states than that in which the cotton was produced. At the other extreme are growers situated in producing areas far removed from the mills in this country and abroad where their cotton is used. Texas falls into this category. In such cases, the cotton usually passes through several hands during its journey from the grower to the manufacturer. The assembling, transportation, storage, risk-bearing and merchandising functions incident to placing the cotton in the consuming establishment have brought into existence an elaborate, integrated and complex marketing organization.

A substantial part of the crop is placed in marketing channels at the gin where it has been prepared for market. Marketing by growers generally follows ginning.

For the season 1935-1936 almost 60% of the sales by growers were made at gins or at street markets, principally at gins. Most of the remainder was sold at warehouses or local cotton yards.

Approximately 40% of the crop is sold immediately upon being ginned. In the Cotton Belt as a whole, about 96% of the crop is sold by the end of the ginning season.

Approximately ½ of the cotton not sold and delivered to buyers immediately upon ginning is stored in public warehouses pending sale. About 10% is hauled back to the farm, and almost 40% is stored on gin yards and on public cotton yards.

The markets consist of (a) producers' local markets, (b) central markets, and (c) spinners' markets, in each of which there are several types of operators such as factors and spot brokers, and domestic and foreign mill holders.

The producers' local markets consist of (1) independent local buyers, (2) representatives of cotton merchants, (3) ginner buyers, (4) representatives of cotton cooperatives, (5) factors, (6) supply merchants, (7) cotton finance companies, and (8) cotton mill buyers. Independent local buyers purchase about 35% of the entire crop; ginner buyers purchase about 30%; representatives of cotton merchants and cooperatives purchase about 10% each.

Approximately ½ of the cotton sold by growers to gin buyers is delivered by the grower to the buyer at the warehouse or compress; ⅓rd at gin yards, and about ⅒th at railroad platforms. The remainder is delivered at public cotton yards, farms, street markets and mills. In a few states most of the cotton is delivered at gins, but in most it is largely delivered to buyers at warehouses or compresses for storage pending shipment within a few days.

Market outlets of first-buyers depend largely upon the proximity of the local market to central and spinners' markets, and upon the method of buying employed. About 60% of the cotton acquired by first-buyers went to central market cotton merchants, 55% by direct transaction and 5% through spot brokers. More than 20% was sold by first-buyers direct to cotton mills.

Independent local buyers sell 64% to central market cotton merchants, shippers and exporters, 31% to mills, 3% to other local buyers and about 2% to cooperatives.

Ginner buyers sell about 66% to central-market cotton merchants, shippers and exporters, 19% to mills, 12% to local buyers and 3% to cooperatives.

About 60% of all cotton is sold to central market cotton merchants, shippers and exporters.

The stipulations, supported by charts, tables, etc., dealing with the supply and demand for cotton, the price, the purchasing power and the effect of these factors upon the American public fully justify and bear out the legislative findings of Congress, especially that part dealing with its effect upon interstate and foreign commerce.

What was said with reference to tobacco in Mulford v. Smith, D.C., 24 F.Supp. 919, 921, is equally applicable with reference to cotton: "Before passing the Act in question Congress made very thorough and deliberate investigation of the business, holding many hearings about it. The Act was not hastily passed but represents the considered and matured conclusion of the Legislature."

The cotton marketing quota regulations are substantially the same as the tobacco quota regulations, as evidenced by the legislative findings and supported by the facts stipulated. American cotton, sold on a world-wide market and moving in interstate and foreign commerce to processing establishments located throughout the world, is predominately national and international in character. The legislation is in the interest not only of the producers but the general welfare of the nation as a whole. Just as tobacco, cotton marketing is regulated because of fluctuations is abnormally excessive supplies, seriously burdening, injuring and tending to destroy interstate and foreign commerce.

Plaintiff's first contention—that the cotton marketing quota provisions of the Act are not in fact regulation of marketing but a palpable effect to control production—is fully answered and disposed of in Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L. Ed ——, supra.

Plaintiff, citing numerous familiar authorities, chiefly relies upon United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 318, 80 L.Ed. 477, 102 A.L.R. 914, in which the Supreme Court struck down the Agricultural Adjustment Act of May 12, 1933, c. 25, 48 Stat. 31, 7 U.S.C.A. § 601 et seq. providing for processing taxes, proceeds from

836

which were to be used to compensate growers entering into voluntary crop contracts with the government. But in that case, in which an able dissenting opinion was written by Mr. Justice Stone (concurred in by Mr. Justice Brandeis and Mr. Justice Cardozo), the opinion by Mr. Justice Roberts recites that: "The act under review does not purport to *regulate transactions in interstate or foreign commerce.* * * * Indeed, the government does not attempt to uphold the validity of the act on the basis of the commerce clause * * *." (Italics supplied)

Mr. Justice Roberts, who wrote the majority opinion in United States v. Butler, supra, is also author of the majority opinion in the later case of Mulford v. Smith, supra. He said [59 S.Ct. 652]: "The statute does not purport to control production. It sets no limit upon the acreage which may be planted or produced and imposes no penalty for the planting and producing of tobacco in excess of the marketing quota. It purports to be solely a regulation of interstate commerce, which it reaches and affects at the throat where tobacco enters the stream of commerce * * * Regulation to be effective, must, and therefore may constitutionally, apply to all sales."

Of course, there is a distinction in the method of marketing tobacco and of cotton. As shown by the opinion of the Supreme Court in the tobacco case, at least two-thirds of all flue-cured tobacco sold at auction warehouses is sold for immediate shipment to an interstate or foreign destination; and in Georgia nearly 100% of the tobacco so sold is purchased by extra State purchasers. On the other hand, in the case of cotton, 75% of all sales finds its way into interstate and foreign commerce. To be sure there are, in many cases, two or three intervening sales, but the delay in actually entering upon the technical stream of commerce is so negligible as to justify the Congressional finding that American cotton *is* "sold on a world-wide market and moves from the places of production almost entirely in interstate and foreign commerce." The difference between the marketing of cotton and that of tobacco is, after all, an immaterial matter of mechanics. As urged in the Government's brief:

"The cotton marketing mechanism is not of the invention of the producer. It has been evolved to serve the convenience of manufacturers. It is not a thing apart from interstate and foreign commerce. It

owes its existence to the very commerce which it facilitates. Regulation of federal commerce must take any market mechanism, as it finds it, into account. At some point in the concatenation of activities that constitute the mechanism, the incidence of the regulation must take place. The precise point will depend upon the type of regulation. Here the regulation is of that modern type known as a quota regulation. Its purpose is to keep off the market excessive supplies. The source of the market supply is the producer. There are numerous producers and they are scattered over a wide area. The only practicable thing to do was to make the regulation effective at that point where there is presented the first opportunity for marketing—sale by the producer. Incidence at any other point would not be feasible. * * *"

█ Since the cotton provisions, like the tobacco provisions, cannot be construed to be an effort by Congress to control production, but is a regulation of marketing directly affecting and burdening interstate and foreign commerce, Mulford v. Smith, supra, seemingly disposes of plaintiff's second contention—that the sales involved in this case are purely local and do not bear the direct or close and substantial effect on interstate commerce which must exist before Congress can regulate such sales.

As stated by Mr. Justice Roberts in Mulford v. Smith, supra: "*Regulation to be effective, must, and therefore may constitutionally, apply to all sales.*" (Italics supplied).

And in the same case, in the opinion of Mr. Justice Sibley, of the Circuit Court of Appeals for the 5th Circuit, 24 F.Supp. 919, 922:

"We may concede that agriculture, mining, manufacture and the like are in themselves local activities, the regulation of which generally belongs to the States and not to Congress. So are sales made within the State not intended at the time to result in removing the goods from the State. But it may not be maintained that such intrinsically local matters do not *under some circumstances* become so interwoven with interstate and foreign commerce as to render it necessary and proper for Congress to affect or control them in order to regulate the interstate and foreign commerce which springs from them. The power of Congress to regulate such commerce is paramount and is very broad. If regulation of any kind is needed, the Congress and not

the States must furnish it; and it may be of any kind not prohibited by other constitutional provisions. A State prior to the Union would so have regulated by virtue of its general police power. After the Union, this sphere of the police power vests in the Congress. Within its sphere, the power of Congress is in its nature a police power, to be exerted for the public good and in any way, not prohibited, which Congress deems calculated to achieve the desired regulatory effect. This may involve, as above stated, the affecting or controlling what would usually pertain to the State police power. Thus, intra-state rates may be controlled by Congress when so involved with interstate commerce as to make it necessary. Possession of intoxicating liquor under prohibition was controlled by Congress though its constitutional power extended only to the manufacture, transportation and sale thereof. Very extensive regulation of the production of distilled liquors has always been allowed to secure payment of the federal taxes on the liquors, though such production would otherwise be only of State concern. But the law in controversy does not *directly regulate* the *production* of tobacco. It does not penalize or forbid the *production* of any amount the grower pleases. He may do what he likes with it except to market it. Since most tobacco is grown only to be sold, the inability to sell the excess of a quota except at a loss at least of all profit would tend to and probably would result in the non-production of the excess so far as the grower can prevent it. But the Act directly deals only with the marketing, and not with the planting or production of tobacco.

"Since marketing is an act of commerce, like transportation, if marketing in interstate and foreign commerce alone had been regulated, there would be no fair doubt of the power of Congress generally to regulate. The trouble arises from the inclusion of *all* sales of tobacco by producers. Congress rests that inclusion on its right to regulate not *particular sales* as such, but the *commerce* in tobacco as a great whole, because it is overwhelmingly a matter of interstate and foreign traffic, and so unified in fact as that it must be dealt with generally and on *a nationwide scale*. The price to producers, the stability of which is asserted by Congress to be a main concern both because the support of hundreds of thousands of persons depends on it, and because it in turn controls the amount of tobacco which will be grown and if too low may destroy the industry altogether, is a countrywide matter. No State acting alone could wisely or effectively regulate the situation. Conflict and reprisals would almost certainly follow State effort. In Georgia all tobacco, except a negligible amount, is sold for export from the State, and this is predominately true in all the States which produce tobacco. The commerce in it is in fact *overwhelmingly interstate and foreign*. The stable supply to meet the stable demand and to result in a stable price which Congress seeks to achieve can in its judgment practically be reached only by a *countrywide regulation controlling the entire market*. Courts may not overrule the considered judgment of Congress on the point, where the conclusion is not clearly irrational and arbitrary. They must enforce the law without questioning its wisdom or effectiveness. Should Congress (except in a case of clear usurpation), seek unjustifiably to control matters which ought to remain with the States the issue becomes so far political that solution might better be had in the elections as of a public question between the States and the Union than in the courts at the instance of private litigants.

"The Act is not a price-fixing one. The price is still fixed by the will of buyer and seller, and more remotely by the circumstances that normally affect prices. It seeks merely to stabilize one of those circumstances, to-wit, the available marketable supply for the year. Protective tariffs affect prices similarly. It does not take the property of any producer. It affects the value of his excess, if intentionally or unintentionally he makes more tobacco than his quota, for he has to hold it for another quota year, or else use it in some other way. In so far as it takes his liberty of selling what is his own for what he can obtain for it, or indirectly affects his liberty to plant what he pleases on his own land, the taking is not without due process of law but is the ordinary restraint of liberty which accompanies every exercise of police power for the public good. One may be prohibited by competent authority from raising or selling tobacco if by so doing he injures others. Sic utere tuo ut alienum non laedas, a nounless maxim, qualifies both the property and the liberties of everyone." (Italics supplied)

This reasoning is equally applicable to cotton.

838

Numerous other authorities are cited by both plaintiff and the intervening defendant. However, in view of the fact that the most recent enunciation of the United States Supreme Court construing the Act in question, as applied to tobacco (Mulford v. Smith, supra), clearly controls the cotton marketing quota provisions as well, it will not be necessary to discuss them.

Bearing in mind the presumption of the validity of an Act of Congress, there being no clear showing of unconstitutionality, this Court has no right to substitute its judgment for that of the Congress. The challenged provisions of the Act—Part IV, subtitle B, title 3, the cotton marketing quota sections—are constitutional.

Let an order be prepared denying recovery to plaintiff of the sums sued for. Counsel will likewise furnish the Court with findings of fact to be filed by the court and upon which the Court will base its conclusions of law.