Lamar BOWERS, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 15275.

United States Court of Appeals
Fifth Circuit.

Oct. 26, 1955.

Rehearing Denied Dec. 1, 1955.

Cameron, Circuit Judge, dissented.

W. H. Albritton, Andalusia, Ala., Albrittons & Rankin, Andalusia, Ala., of counsel, for appellant.

Hartwell Davis, U. S. Atty., Neil Brooks, Associate Solicitor, Donald A. Campbell, Washington, D. C., J. Stephen Doyle, Jr., Special Asst. to the Atty. Gen., Howard Rooney, U. S. Dept. of

Agriculture, Washington, D. C., for appellee.

. Before HUTCHESON, Chief Judge, and TUTTLE and CAMERON, Circuit Judges.

HUTCHESON, Chief Judge.

The suit was for the collection of penalties assessed against the defendant under Section 1359(a) of the Agricultural Adjustment Act of 1938, as amended,[1] because of his failure to account for the disposition of peanuts raised by him in the years 1950–1951.

The claim was: that appellant in 1950 and 1951 engaged in the production of peanuts on his farm, and harvested in excess of his farm acreage allotments; that he failed and refused to comply with a written request from the State Committee to account for the disposition of the peanuts; and that thereupon and because thereof he became subject to and was assessed the penalties for which plaintiff sues.

Defendant filed a motion to dismiss on several grounds. One was that the complaint was deficient in that it failed to charge that he had marketed, sold, or otherwise disposed of any peanuts harvested by him during either 1950 or 1951 from his farm, in such manner or under such conditions as to make him subject to any lawful penalty imposed by Title 7 U.S.C.A. § 1359.

Another was that the provision of Sec. 1359(a), Title 7 U.S.C.A., under which the penalty was allegedly assessed, "If any producer * * * fails to account for the disposition of any peanuts, an amount of peanuts equal to the normal yield of the number of acres harvested in excess of the farm acreage allotment shall be deemed to have been marketed in excess of the marketing quota for the farm, and the penalty in respect thereof shall be paid and remitted by the producer", either created a rebuttable presumption of fact, that plaintiff had marketed excess peanuts, which defendant's evidence had rebutted, or it attempted, in violation of the Constitution, to establish an irrebuttable presumption of fact, that defendant had marketed excess peanuts, and was invalid.

In the alternative, defendant moved for a summary judgment on the ground that there was no genuine issue as to any material fact and in support attached the affidavit of himself and his wife to the effect that, while defendant had planted and raised peanuts in 1950 with the idea that if he were allowed to market any of them he would do so, and in 1951 with the knowledge that he would not be allowed to do so, his primary purpose in planting them in each of the years was to use them for feed for his livestock and when in each year he was unable to market any, he did use all of them for feed.

Plaintiff, on its part, filed requests for admissions under Rule 36, Fed.Rules Civ.

---

1. 7 U.S.C.A. § 1359(a), as material here, provides as follows:

"(a) The marketing of any peanuts in excess of the marketing quota for the farm on which such peanuts are produced, or the marketing of any peanuts from any farm for which no acreage allotment was determined, shall be subject to a penalty at a rate equal to 50 per centum of the basic rate of the loan (calculated to the nearest tenth of a cent) for farm marketing quota peanuts for the marketing year August 1—July 31. Such penalty shall be paid by the person who buys or otherwise acquires the peanuts from the producer, or, if the peanuts are marketed by the producer through an agent, the penalty shall be paid by such agent, and such person or agent may de- duct an amount equivalent to the penalty from the price paid to the producer. * * * If any producer falsely identifies or fails to account for the disposition of any peanuts, an amount of peanuts equal to the normal yield of the number of acres harvested in excess of the farm acreage allotment shall be deemed to have been marketed in excess of the marketing quota for the farm, and the penalty in respect thereof shall be paid and remitted by the producer. * *; and if proof of the disposition of any amount of peanuts is not furnished as required by the Secretary, the acreage allotment next established for the farm on which such peanuts are produced shall be reduced by a percentage similarly computed. * * *"

Proc. 28 U.S.C.A., and the defendant admitting: that he did, as claimed by plaintiff, plant and harvest peanuts from his farm in excess of his acreage allotment; that in each of the years he had received a request from the marketing committee for a written report of his production; that he had not complied with the request; that he was notified that penalties had been assessed against him; and that he had not paid the penalties; plaintiff moved for summary judgment. Thereupon the district judge granted the motion and, filing findings of fact and conclusions of law, 123 F.Supp. 184, 185,[2]

2. "This is an action instituted by the United States for the purpose of collecting marketing penalties as provided in Section 1359(a) of the Agricultural Adjustment Act of 1938, as amended (7 U.S.C. 1281 et seq., 1359(a), from the above named defendant.

"Findings of Fact

"1. Defendant, during 1950 and 1951, engaged in the production of peanuts on farm No. C–7 in Coffee County, Alabama, within the jurisdiction of this court.

"2. The Coffee County Production and Marketing Administration Committee, in accordance with provision of the Act and of the Marketing Quota Regulations for the 1950 crop of peanuts, established for that farm a peanut acreage allotment of 14.7 acres. Defendant planted and harvested 26.8 acres, which was 12.1 acres in excess of his allotment, and hauled the peanuts to another farm owned by him in Covington County, Alabama.

"3. The Coffee County Production and Marketing Administration Committee in 1951 reduced defendant's peanut acreage allotment for farm No. C–7 to zero acres, but defendant planted and harvested 25.2 acres, the production of which he also hauled to his Covington County farm.

"4. By letters dated Sept. 11, 1952 and Jan. 15, 1954, the Alabama State Production and Marketing Administration Committee requested Defendant to submit written reports covering his production of peanuts each year and to account for its disposition, which the defendant did not do.

"5. Under the regulations, the defendant was entitled to a marketing card for 1950 which would have enabled him to sell his allotment peanuts, which represented his marketing quota, free of penalty and his excess peanuts subject to penalty. He was also entitled to an excess card for 1951 which would have entitled him to sell his peanuts subject to penalty, had he applied for them.

"6. Plaintiff, seeking a summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, 28 U.S. C.A., contends that the only fact necessary to support its claim for penalties for each of the years involved, is the admission by defendant that he, the defendant, failed to account for the disposition of his peanut crops, in writing, to the Production and Marketing Committee.

"7. Defendant, in support of his motion to dismiss, contends that Section 1357, Title 7, U.S.C.A., does not govern 'the production of peanuts,' but is applicable to and governs only the 'marketing' of peanuts; that the allegation in plaintiff's complaint that 'peanuts were hauled away from the farm' does not constitute an allegation that the peanuts were 'marketed' within the meaning of the Act; that, as a matter of fact, the peanuts were not 'marketed' by the defendant, but were fed to his live stock; that certain provision of Section 1359(a) of the Act are unconstitutional, as if the failure to afford the defendant an opportunity to explain at a hearing, especially to this court, his disposition of his peanut crops.

"Conclusions of Law

"1. The Act, and the decisions interpreting it, empower the Production and Marketing Administration Committee to control the total supply of peanuts available for market, which includes control of individual supply to the extent that a producer who grows peanuts, harvests and threshes them, must make a written accounting to the Committee of the disposition of excess peanuts, or, failing to so account for their disposition, is deemed to have marketed them in excess of his marketing quota for that farm.

"2. Under Section 1373(b) of the Act, the defendant was required to submit a written report of the production of peanuts on Farm No. C–7, and to account for disposition of said crop to the Alabama State Production and Marketing Administration Committee, which Committee requested such report, as provided by the Act, and the burden of proof was on the defendant to show to the Committee, by such written report, what disposition was made of the excess peanuts, or that he was not engaged in the production of such peanuts for market.

"3. The burden is not on the Production and Marketing Committee to show that the peanuts were produced for market, but the burden is on the defendant to show to the Committee that the pea-

entered a judgment assessing the penalties as prayed.

Appealing from that judgment appellant, in his brief, thus states his position:

"A. The District Court erred in rendering the Summary Judgment in favor of Appellee. It is based solely on—

"(a) The admission by Appellant that he failed to account for the disposition of his peanut crop, in writing, to the Production and Marketing Committee, and

"(b) The provision of Sec. 1359, Title 7 U.S.C.A. that: 'If any producer * * * fails to account for the disposition of any peanuts, an amount of peanuts equal to the normal yield of the number of acres harvested in excess of the farm acreage allotment shall be deemed to have been marketed in excess of the marketing quota for the farm, and the penalty in respect thereof shall be paid and remitted by the producer.'

"Without regard for the actual fact that the peanuts were not 'marketed' and, that Appellant did not in any manner dispose of the peanuts by voluntary or involuntary sale, barter, exchange, or by gift inter vivos, but in actual fact used them for his own seed and feed for his own livestock. Hence the judgment must rest upon the holding that the quoted provision of Sec. 1359 either created (1) a substantive rule of law, or (2) an absolute, irrebuttable presumption of fact. Appellant respectfully submits that—

"1. The quoted provision of Sec. 1359 did not create a substantive rule of law, and

"2. A conclusive, irrebuttal presumption of fact violates the Fifth Amendment and Art. III of the Constitution of the United States of America.

"3. If the Section did attempt to create a substantive rule of law, Congress did not intend the rule to apply to farmers producing peanuts for domestic, or farm consumption, but

"4. If Congress did intend to create a substantive rule of law applicable to farmers producing peanuts for domestic, or farm consumption, such rule would be unconstitutional and void as being beyond the powers of Congress under Art. I, Sec. 8 of and in contravention of the Tenth Amendment to the Constitution of the United States of America."

Proceeding, then, to argue in turn each of his four points against the judgment, appellant has managed by his earnestness in presenting, his diligence in developing, and his skill in supporting his points to invest the question underlying decision here, a question which on its face seems to us quite simple, the answer to it quite plain and clear, with an appearance of difficulty and complexity and to impart to his argument an impressiveness which has convinced the court as a whole of his complete sincerity and his confidence in the correctness of his views, and has evoked from one member of the court a dissent in support of them.

 Impressed, however, as we might be with the contentions of appellant and

---

nuts were not marketed. Under the Act, the defendant was required to account to the Committee for the disposition of the peanuts, and failure to so account to the Committee created a presumption that the peanuts were produced for market, and made the defendant subject to the penalties under the Act.

"4. The requirement that written reports be made to the Committee was reasonable and in accordance with the Act. The plaintiff may not refuse to present

his explanation through Administrative channels that are reasonable and proper, preferring to await a judicial determination to rebut the provisions of the Act which make a failure to account to the Committee for the disposition of peanuts a conclusion that the peanuts were marketed.

"5. The provisions of Section 1359(a) do not violate the 5th and 10th Amendments nor Article III of the Constitution."

the arguments and authorities [3] marshalled in their support, if we could agree with his views that the statute under construction means what and operates as appellant claims it does, we are constrained to declare: that in our opinion the language of the statute, note 1, supra, under the authority of which the penalties were assessed and recovered, is simple and clear in its terms and meaning and wholly free from the defects, constitutional or otherwise, with which appellant charges it; and that the penalties provided for in the statute and exacted in this case were based not, as defendant claims, upon his having marketed peanuts but simply and entirely upon his failure to account for their disposition. Without, then, joining issue with appellant on his arguments or discussing the authorities he cites in support of the unfounded assumptions he makes, we reject his propositions, arguments, and authorities as wholly inapplicable here. Rejecting his contention, that the quoted provisions of Sec. 1359(a) did not declare a substantive rule of law but merely created a presumption of fact, we particularly affirm to the contrary: that the language under review "an amount of peanuts * * * shall be deemed to have been marketed in excess of the marketing quota for the farm and the penalty in respect thereof shall be paid and remitted by the producer" was intended to operate not as a presumption of fact rebuttable or otherwise, but as the statement of a substantive rule of law, the meaning, purpose and effect of which was to lay down as a rule of law that the penalty imposed for the failure to account for the disposition of the peanuts to be collected from the producer was the same as that the statute provided for excess marketing. In short, we find ourselves in complete agreement with the findings and conclusions of the district judge and with the contentions of the appellee as to the purpose and effect of the statute as they are thus set out in its brief:

"I. The Act and the regulations require each producer of peanuts to account for the disposition of all peanuts produced by such person. The appellant failed to make such accounting and is liable for civil penalties.

"A. The appellant admits that he failed to make the required accounting.

"B. The statutory and regulatory provisions require each producer of peanuts to account for the disposition of all peanuts produced by such person. * * *

"C. The Act creates an irrebuttable presumption; i. e. a rule of substantive law, that failure to account for the disposition of all peanuts produced subjects the producer to the penalty provisions." [4]

"II. The provisions of the Act are constitutional.

"A. The creation of an irrebuttable presumption; i. e. a rule of substantive law that failure to account for the disposition of all peanuts produced subjects the producer to the penalty provisions, is not violative of the Constitution.

* * * * * *

"C. The statutory requirement for producers to account for the disposition of all peanuts produced by them is within the scope of the commerce clause in the Constitution." [5]

---

3. Particularly Heiner v. Donnan, 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772.

4. See in support Cunningham v. United States, 5 Cir., 67 F.2d 714; City of New Port Richey v. Fidelity & Deposit Co., 5 Cir., 105 F.2d 348, 123 A.L.R. 1352; Amerada Petroleum Corp. v. 1010.61 Acres of Land, 5 Cir., 146 F.2d 99; United States v. Jones, 9 Cir., 176 F.2d 278;

Wigmore on Evidence, 3rd Ed. Vol. 4, Sec. 1352; 11 Words and Phrases, Deem, p. 481, as "considered or taken to be", and cases there cited, and King v. McElroy, 37 N.M. 238, 21 P.2d 80.

5. See United States v. Darby, 312 U.S. 100, 118, 61 S.Ct. 451, 85 L.Ed. 609; United States v. Wrightwood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed.

If we are correct in these views, and we are not in any doubt that we are, then the whole argument of appellant falls for it is untenably based upon the view: that the act or omission penalized in this case was not the failure to report on the disposition of the peanuts as the statute provides and as the complaint charged but that failure coupled with proof that the peanuts had been marketed contrary to the quota; that, therefore, the provision in the statute that an amount of peanuts "shall be deemed to have been marketed in excess of the marketing quota for the farm" was intended to create, and does create, a presumption of fact; and that for the court to construe it as conclusively making him liable for the penalty fixed for such a marketing either is an incorrect construction of the meaning and intended effect of the statute, or, if a correct one, renders the statute invalid as creating an irrebuttable presumption of fact.

■ Thus appellant's contention that the penalty was wrongfully assessed against him because either the statute fixed an irrebuttable presumption of fact that excess peanuts were marketed by him and his undisputed proof overcame this presumption or if the presumption was irrevocable the statute was invalid, is seen to be without basis. For no matter what might be said of such a statutory effort if appellant's theory were correct, the theory can have no application here for the penalty was assessed for failure to report and the only function of the objected to clause is to say that because of the failure to report there shall be exacted the penalty providing for excess marketing. It is true that appellee does argue that the language "shall be

deemed", etc., does create an irrebuttable presumption, but it is equally plain that the presumption argued for is not one of fact but of law. It is not, as appellant maintains, a presumption of fact, that appellant did market these peanuts, but of law, that because of his failure to report their disposition he became liable to a penalty for not doing so, and for the purpose of measuring the penalty he is to be treated as he would have been treated if he had been guilty of excess marketing.

The judgment was right. It is affirmed.

CAMERON, Circuit Judge (dissenting).

In my opinion, the result announced by the majority opinion is reached by a tortured construction of the plain language of a statute having a definitely ascertainable meaning, and denies to appellant rights guaranteed to him by the Constitution. I dissent, therefore, and set forth the reasons therefor.

### I.

The statute construed is included in the portion of the Agricultural Adjustment Act of 1938 devoted exclusively to peanuts, Part VI, "Marketing Quotas—Peanuts". This section of the Act bears the heading, "Marketing Penalties", and begins with these words:[1]

"(a) *The marketing of any peanuts* in excess of the marketing quota for the farm on which such peanuts are produced, or the marketing of peanuts from any farm for which no acreage allotment was determined, *shall be subject to a penalty* at a rate equal to 50 percentum of the basic rate of the loan * * * for

726; United States v. Rock Royal Co-op., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122; Mandville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; United States v. Walsh, 331 U.S. 432, 67 S.Ct. 1283, 91 L.Ed. 1585. See also the

argument of Mr. Justice Stone dissenting in Heiner v. Donnan, 285 U.S. at page 338, 52 S.Ct. at page 365; and cases cited, particularly La Belle Iron Works v. United States, 256 U.S. 377, 41 S.Ct. 528, 65 L.Ed. 998.

1. 7 U.S.C.A. § 1359. Where emphasis is shown here, or in any other quotation, it is supplied by us unless otherwise indicated.

farm marketing quota peanuts for the marketing year * * *."

The portion of this statute we are called upon to construe follows that above quoted, after the omission of a half page of provisions not directly involved, and is thus worded:

> "If *any producer* falsely identifies or fails to account for the disposition of any peanuts, an amount of peanuts equal to the normal yield of the number of acres harvested in excess of the farm acreage allotment *shall be deemed to have been marketed in excess of the marketing quota for the farm,* and the penalty in respect thereof shall be paid and remitted by the producer."

The majority turns its back upon the language of the statute emphasized in the quotation, declining to give that language its usual and ordinary meaning; but, on the other hand, creates a fiction [1a] not springing from the language used. Such a procedure does violence to fundamental rules of construction universally recognized by the courts and attributes to the words used a meaning at war with other portions of the Agricultural Adjustment Act dealing with the other commodities covered by it.

The fiction on which the decision is based was discovered by the majority. The entire argument made before us orally and set forth in the briefs is directed to the question whether the words last quoted created a conclusive presumption or a rebuttable presumption. I think we should hold that these words create a rebuttable presumption, and such a holding will bring this portion of the statute into harmony with the remainder of it, will give to the words a definition in line with the understanding of the average man, and will remove the statute from the taint of unconstitutionality with which the majority opinion invests it.

## II.

(a) The crucial words, "shall be deemed to have been marketed", should, if possible, be given the meaning which they would carry to the average man. The Supreme Court, in construing a statute of a character and vintage not far removed from this one, expressed the idea in these words: "For the ultimate question is what has Congress commanded, when it has given no clue to its intentions except familiar English words and no hint by the draftsmen of the words that they meant to use them in any but an ordinary sense. * * * After all, legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him." [2]

---

1a. The majority has substituted for the words of the paragraph last quoted its own words of this import:

> "If any producer fails to account for the disposition of any peanuts * * * the penalty to be collected from the producer shall be the same as the penalty assessed for excess marketing."

Of course the statute does not contain any words remotely resembling those. Moreover, the words actually appearing in the statute are in a paragraph headed, "Marketing Penalties". Nothing in the statute indicates that non-reporting as such should suffer a penalty and no other provision of the Act relating to any other commodities does inflict any penalty for non-reporting. It is clear that Congress was engaged in providing a *prima facie* presumption just as it had provided with respect to all other commodities which would facilitate proof of marketing in excess of quotas.

2. From Addison v. Holly Hill Fruit Products, Inc., 1944, 322 U.S. 607, 617–618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488, construing the language of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. The following relevant language is used in the opinion both before and after the quoted language, 322 U.S. at pages 617–618, 64 S.Ct. at page 1221:

> "We should of course be faithful to the meaning of a statute. But after all Congress expresses its meaning by words. If legislative policy is couched in vague language, easily susceptible of one meaning as well as another in the common speech of men, we should not stifle a policy by a pedantic or grudging process of construction. To let general words draw nourishment from their purpose is one

The graphic language of Mr. Justice Holmes is of similar import: [3]

"Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear. When a rule of conduct is laid down in words that evoke in the common mind only the picture of vehicles moving on land, the *statute should not be extended* to aircraft simply because it may seem to us that a similar policy applies, or *upon the speculation that if the legislature had thought of it, very likely broader words would have been used.* * * * "

In another recent case [4] the Supreme Court used similar language: "In the first place, the words of statutes * * * should be interpreted where possible in their ordinary, everyday senses", and relied heavily upon dictionary definitions to ascertain the meaning of the word there involved so defined. Webster's New Practical Dictionary [5] thus defines the verb, deem: "To think; suppose". In the College Edition of Webster's New World Dictionary [6] deem is defined thus: "To think; believe; judge". If the ordinary man is justified in ascribing to words meanings contained in smaller dictionaries such as are normally found in the possession of such men, he will attribute to the word under consideration the concept of thinking, considering, supposing, believing, judging. All of those words have a tentative connotation; none of them brings to mind a picture of finality, of conclusiveness. The strongest, judge, contains the idea of hearing both sides of a controversy and giving judgment according to the truth as gleaned therefrom. To the average man, therefore, the clause would carry the thought that the peanuts "shall be considered to have been marketed in excess of the marketing quota for the farm * * *".

(b) But the average man must know the law and must take into account what the courts have decided about words in making up his mind the meaning he will give them. The only word in the clause before us which has a debatable meaning is the word, deem, and that word has been judicially defined as supporting the argument in favor of a conclusive presumption and the argument in favor of a rebuttable presumption, but has never been defined in such a way as to support the fiction which the majority opinion has created.

The Government's position set forth in its argument—but not adopted by the majority—that deem, when used, creates a conclusive presumption of fact, is supported by several cases.[7] The Govern-

---

thing. To draw on some unexpressed spirit outside the bounds of the normal meaning of words is quite another. * *

"Legislation introducing a new system is at best empirical, and not infrequently administration reveals gaps or inadequacies of one sort or another that may call for amendatory legislation. But it is no warrant for extending a statute that experience may disclose that it should have been made more comprehensive. 'The natural meaning of words cannot be displaced by reference to difficulties in administration.' * * *

"While the judicial function in construing legislation is not a mechanical process from which judgment is excluded, it is nevertheless very different from the legislative function. Construction is not legislation and must avoid 'that retrospective expansion of meaning which properly deserves the stigma of judicial legislation'. * * * To blur the distinctive functions of the legislative and judicial processes is not conducive to responsible legislation."

3. McBoyle v. United States, 1931, 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (a criminal case).

4. Crane v. Commissioner, 1946, 331 U.S. 1, 6, 67 S.Ct. 1047, 1051, 91 L.Ed. 1301.

5. G. & C. Merriam Co., 1953, p. 175.

6. The World Publishing Co., 1954, p. 383.

7. Douglas v. Edwards, 2 Cir., 1924, 298 F. 229; United States v. Davis, D.C.W.D.

ment leans heavily upon our case of City of New Port Richey v. Fidelity & Deposit Co. of Maryland, 5 Cir., 1939, 105 F.2d 348, 123 A.L.R. 1352, as declaring that the use in a statute of the word, deem, establishes a conclusive presumption. An examination of that case will show that it does not sustain this position. We were there considering the Negotiable Instruments Law of Florida which spelled out a conclusive presumption in precise words.[8]

In defining the nature and validity of the conclusive presumption created by the Florida statute, we merely used the word, deem, as one of the words sometimes employed in statutes designed to reach that result. But, at the same time, we used such an innocuous word as "presume" as illustrating the same thesis, although admittedly that word is more commonly found in statutes creating only rebuttable presumptions. One case strongly relied upon by the Government[9] in reality supports the opposite position because the court there held that deemed was to be construed as having the same meaning as regard, presume, or consider.

Appellant on the other hand lines up a respectable array of authorities denying to "deem" the absolute quality with which the Government throughout its argument seeks to invest it. The Supreme Court of Oregon[10] held that the parties may by express words create a joint tenancy even though the statute abolished joint tenancy and provided that, " 'All persons having an undivided interest in real property are to be deemed and con-

sidered tenants in common' ". 5 O.C. L.A. § 70–205. That court found that the word "usually implies a conclusive presumption or an adjudication, but it may connote a disputable one".

The Supreme Court of West Virginia held the word to create only a rebuttable presumption in a case[11] involving whether the company was a cooperative association under the Sales Tax Law. The statute provided that, " 'Such association shall be deemed nonprofit' ". Code W.Va. 19–4–1(c). While the court held that the facts showed that the company was a profit organization, it used this language in refusing to make the holding under the presumption:

"The verb 'to deem' is ordinarily defined to mean 'to think,' 'to suppose,' 'to opine.' Therefore, the last quoted language carries the meaning that such association does not beyond peradventure have the standing of a non-profit organization, but that it shall have that *prima facie* rating."

To the same effect is a decision of the Supreme Court of Appeals of Virginia[12] construing a statute which provided that spirits in the possession of a person and in containers not bearing the required Government stamp or seal "shall be deemed for the purposes of this act to have been illegally acquired". Code Va.1936, § 4675(50) as amended Laws 1938, c. 234. The Court declined to hold the statute unconstitutional by declaring that it created not a conclusive but a rebuttable presumption.[13]

Mo.1930, 50 F.2d 903; Harder v. Irwin, D.C.N.Y.1923, 285 F. 402; Leonard v. Grant, C.C.Or.1880, 5 F. 11; First National Bank of Eugene v. Dodd, 1926, 118 Or. 1, 245 P. 503; In re Waldron's Estate, 1928, 84 Colo. 1, 267 P. 191; Irwin v. Pickwick Stages System, 1933, 134 Cal.App. 443, 25 P.2d 998.

8. Section 6776 of the Compiled General Laws of Florida, 1927, F.S.A. § 674.18, is in these words: "But where the instrument is in the hands of a holder in due course a valid delivery thereof by all parties prior to him so as to make them liable to him is conclusively presumed."

9. McCluskey v. Hunter, 1938, 53 Ariz. 513, 266 P. 18.

10. Erickson v. Erickson, 1941, 167 Or. 1, 115 P.2d 172, 173.

11. Sanitary Milk & Ice Cream Co. v. Hickman, 1937, 119 W.Va. 351, 193 S.E. 553, 555.

12. Miller v. Commonwealth, 1939, 172 Va. 639, 2 S.E.2d 343, 346.

13. The language is very much the same as the previous case:
"The word, therefore, has more than one meaning. Its meaning is often dependent upon the circumstances in con-

Similarly the Supreme Court of Tennessee [14] held that "deemed" was synonymous with "presumed" as used in the statute there considered; and the Supreme Court of North Dakota [15] held that the word created only a rebuttable presumption where the statute provided that failure to file an order within a certain number of days should bring about a situation where the matter should be "deemed" to have been decided against the application in question [16] and that the word "deem" as used in the charge of the court was "clearly the equivalent of 'presumed'"; and in Dilworth v. Schuylkill, etc., Co., 1908, 219 Pa. 527, 69 A. 47, the Supreme Court of Pennsylvania held that the term should import the same as "shall mean".

A case of unusual interest is Manley v. State of Georgia, 279 U.S. 1, 49 S.Ct. 215, 73 L.Ed. 575, reversing 166 Ga. 563, 144 S.E. 170, 177, in which the meaning of deem was involved. A Georgia statute provided that " 'Every insolvency of a bank shall be *deemed* fraudulent, and the president and directors shall be severally punished * * *; provided, that the defendant * * * may repel the *presumption* of fraud by showing * * *.' " Acts Ga.1919, pp. 135, 219, § 28. The emphasized words show that deem and presume are intended to have the same meaning. If that word should be construed as having the universal

meaning of "conclusively presumed" as contended by the Government, this statute would create a paradox—i. e., permitting a conclusive presumption to be repelled. The decision is further significant in that it demonstrates the extent to which the Supreme Court goes in striking down even *prima facie* presumptions.[17]

### III.

(a) The construction placed upon the clause in question by the majority in setting up its fiction brings the penalty provisions applying to peanuts into collision with cognate provisions governing the other commodities regulated by the Agricultural Adjustment Act of 1938. That Act [18] comprises nearly a hundred sections. Its provisions apply to cotton, wheat, corn, tobacco, rice and peanuts, some sections applying to all and some only to the individual commodities. A penalty is provided for marketing each of these commodities in violation of the terms of the Act [19] and provision is made separately for the enforcement of the penalty applying to each commodity by establishing a presumption in the case of each of the commodities except wheat. In the case of tobacco, Section 1314, the same word is used as the statute with which we are now concerned. In the case of corn, Section 1325(b), the presumption is rebuttable and is spelled out in explicit terms.[20] In the case of wheat,

---

nection with which it is used. Its use does not justify, in all cases, the interpretation that it signifies an arbitrary exercise of judgment; it may signify a deliberate exercise subject to other proof. "* * * Had it [the Legislature] intended to make such possession a conclusive presumption that the liquor had been illegally acquired it could have used the word 'conclusively' before the word 'deemed'."

14. Moody v. State, 1929, 159 Tenn. 245, 17 S.W.2d 919.

15. Kleppe v. Odin Township, 1918, 40 N.D. 595, 169 N.W. 313.

16. And see also Cooper v. Slaughter, 1912, 175 Ala. 211, 57 So. 477, 481.

17. The following disconnected sentences are taken from the opinion, 279 U.S. 6,

7, 49 S.Ct. 217: "If the presumption is not unreasonable and *it is not made conclusive* of the rights of the person against whom raised, it does not constitute a denial of due process of law. * * * A statute creating a presumption that is arbitrary *or that operates to deny a fair opportunity to repel it* violates the due process clause * * *. The connection between the fact proved and that presumed is not sufficient. Reasoning does not lead from one to the other."

18. Chapter 35, Title 7 U.S.C.A.

19. These penalties are provided under the following sections of Title 7 U.S.C.A.: Tobacco, Section 1314; Corn, Section 1325(a); Wheat, Section 1339; Cotton, Section 1346; Rice, Section 1356; Peanuts, Section 1359.

20. Section 1325(b): If corn stored under

as stated, no provision is made for shifting the burden of proof in cases brought for penalty enforcement.

The presumptions with respect to cotton, Section 1346(b), and with respect to rice, Section 1356, are couched in the same words and use the word "regarded" as the key word: "The farm marketing excess of cotton [or rice, as the case may be] shall be *regarded* as available for marketing and the amount of penalty shall be computed upon the normal production * * *".

It appears, therefore, that no presumptions are provided with respect to wheat, that a mild rebuttable presumption is provided explicitly with respect to corn, and that the presumption raised by the word "regarded" is prescribed with respect to cotton and rice. The common acceptation of the verb "regard" ascribes to it a meaning such as to treat, to look upon, to consider, e. g., I regard him as my enemy. That word does not imply the absolute, but the conditional. It would hardly be contended that Congress intended to raise a conclusive presumption against a farmer when it used so mild a word. On the other hand, it is clear that the presumption raised by that word is a rebuttable presumption.

(b) Under the holding of the majority, Congress has placed peanut and tobacco growers under the heavy burden of a conclusive presumption while subjecting the growers of the other four commodities dealt with in the same Act under the lighter burden of a rebuttable presumption or under no burden at all. All six of these commodities are dealt with in the Agricultural Adjustment Act, which ought to be construed as a symmetrical whole. To construe it as the Government contends and the majority holds would tend to distort the statute and to bring its different sections into disharmony. That ought to be avoided unless there is compelling reason to assume that Congress intended to single out some farmers covered by it for harsher treatment than that accorded to other farmers. We ought to look to the statute as a whole to determine the meaning of each of its parts.

American Jurisprudence [21] distills the rule established by the cases and sets it out in these words: "The various provisions of an Act should be read so that all may, if possible, have their due conjoint effect without repugnancy or inconsistency, so as to render the statute a consistent and harmonious whole". The text of Corpus Juris Secundum [22] is to the same effect: "All parts, provisions, or sections of a statute or section, must be read, considered, or construed together, and each must be considered with respect to, or in the light of, all the other provisions or sections, and construed in connection, or harmony, with the whole. So, in determining the meaning of a particular word, phrase, or clause, as used in a statute, the entire statute is to be considered." [23]

seal equals the storage amounts for the farm plus storage amounts for other crops, "*the farmer shall be presumed not to be violating the provisions of sub-section (a)* * * *". But when the stored amount is less than the amount applicable to such crop plus storage amounts of other crops, "*the farmer shall be presumed to have marketed*, while farm marketing quotas were in effect, corn in violation of * * * sub-section (a)". In any action brought under these conditions, the farmer "*shall have the burden of proving* that he did not market corn in violation of the provisions. * * *"

21. 50 Am.Jur., Statutes, Sec. 363, p. 368.

22. 82 C.J.S., Statutes, § 345, p. 694 et seq.

23. The language of the above two texts is taken from a series of Supreme Court decisions: United States v. Freeman, infra; Market Co. v. Hoffman, 101 U.S. 112, 116, 25 L.Ed. 782; United States v. Lexington, etc., Co., 232 U.S. 399, 410, 34 S.Ct. 337, 58 L.Ed. 658; Federal Power Commission v. Panhandle, etc., Co., 337 U.S. 498, 514, 69 S.Ct. 1251, 93 L.Ed. 1499, and a large number of state court decisions assembled in the notes to the texts. And cf. Brown v. Duchesne, 19 How. 183, 194, 60 U.S. 183, 194, 15 L.Ed. 595, and People of Puerto Rico v. Shell Co., 302 U.S. 253, 258, 58 S. Ct. 167, 82 L.Ed. 235.

The Supreme Court[24] thus expressed it: "The correct rule of interpretation is, that if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them, and it is an established rule of law, that all acts in *pari materia* are to be taken together, as if they were one law." We enforced the rule of symmetry and equal treatment[25] by declining to follow the literal wording of a statute requiring three members of a board to act affirmatively on any matter because "That would introduce a new rule, a rule of unanimity, at war with the other quoted references to a majority."

That rule stands in the way also of the majority holding that Congress intended to establish a rule of substantive law when providing for the mechanics for enforcing the penalty as to peanuts while it is conceded that, with respect to the other commodities embraced in the Agricultural Adjustment Act (except tobacco) Congress had provided nothing more than a rule of evidence.[26] It would not be presumed that Congress intended to depart from the set pattern of providing, by rule of evidence, the mechanics for the enforcement of this Act with respect to the major commodities, like wheat, corn, cotton and rice, by shifting to a rule of substantive law with respect to peanuts and tobacco, commodities of relatively minor importance.[27]

### IV.

The holding of the majority that the statute creates a fiction in the form of a rule of substantive law establishing a conclusive presumption, as against a rule of evidence establishing a rebuttable presumption is further erroneous in that it runs afoul the principle that courts will not construe a statute in such a way as to require that it be declared unconstitutional or to bring it near the border-line of unconstitutionality. "It is elementary when the constitutionality of a statute is assailed, if the statute be reasonably susceptible of two interpretations, by one of which it would be unconstitutional and by the other valid, it is our plain duty to adopt that construction which will save the statute from constitutional infirmity."[28] The same idea was repeated in American Communications Association, C. I. O., v. Douds, 339 U.S. 382, 407, 70 S.Ct. 674, 688, 94 L.Ed. 925:

> "It is within the power and is the duty of this Court to construe a statute so as to avoid the danger of unconstitutionality if it may be done in consonance with the legislative purpose."

And the words of Mr. Justice Holmes in Federal Trade Commission v. American Tobacco Co., 264 U.S. 298, 307, 44 S.Ct. 336, 338, 68 L.Ed. 696, point to the course we should follow here: "We cannot attribute to Congress an intent to defy the Fourth Amendment or even to

---

24. United States v. Freeman, 3 How. 556, 564, 44 U.S. 556, 564, 11 L.Ed. 724.

25. Austin-Western, etc., Co. v. Fayette County, 5 Cir., 1938, 99 F.2d 565, 568.

26. It is well established that "what is termed a 'conclusive presumption', in most instances is actually a rule of substantive law". Ellis v. Henderson, 5 Cir., 1953, 204 F.2d 173, 175, and the authorities there cited.

27. The Government sets out the legislative history of the penalty provision of the Act as related to peanuts, but the most the argument tends to establish is that Congress amended the penalty provisions by substituting a price per pound in place of the original penalty based on so much

per acre. But the legislative history does not have any tendency to establish the thesis that Congress essayed to discriminate against peanuts in setting up the machinery for enforcing the penalty. Assuming that such a discrimination could be practiced if based upon compelling reasons, the whole argument falls as it relates to the supposed establishment of a conclusive presumption versus a rebuttable presumption and a rule of substantive law as against a rule of evidence because no sound reason appears for such a discrimination.

28. United States v. Delaware & Hudson Co. and companion cases, 213 U.S. 366, 407, 29 S.Ct. 527, 535, 53 L.Ed. 836.

come so near to doing so as to raise a serious question of constitutional law".

And no one can deny that a serious question of constitutional law is raised by the construction given the language in question as establishing a conclusive presumption. It is a fundamental rule of the American System that litigation shall be decided upon the facts placed before the court, and it is basically repugnant to that system that any rule shall be recognized which shuts off the free flow of facts before the court. In its text on Constitutional Law, American Jurisprudence [29] lays down the rule thus: "A conclusive presumption, or a presumption that operates to deny a full opportunity to repel it, violates the due process clause. Even a statute that hurts the evidence that may be offered in rebuttal of the presumption is invalid * * *".

This language is quoted from a Supreme Court decision [30] in a case in which the court rejected the then well-established conclusive presumption that a married woman was capable of bearing children as long as she lived, and held that presumption to be rebuttable in the light of scientific knowledge. During the course of the decision the court quotes from a textbook this language, 291 U.S. at page 282, 54 S.Ct. at page 391: "By an arbitrary rule, to preclude a party from adducing evidence which, if received, would compel a decision in his favor, is an act which can only be justified by the clearest expediency and soundest policy * * *"; and quotes 1 Wigmore on Evidence, 2d Ed. Par. 11, as stating the basis for the interposition of an irrebuttable presumption which holds that evidence of certain kinds of facts is excluded, is "because its admission would injure some other cause more than it would help the cause of truth, and because the avoidance of that injury is considered of more consequence than the possible harm to the cause of truth".

The whole subject is treated and effectively disposed of by the Supreme Court in Heiner v. Donnan, 285 U.S. 312, 52 S. Ct. 358, 76 L.Ed. 772, wherein the court declared unconstitutional a provision in the Internal Revenue Laws [31] establishing a conclusive presumption that transfers of property were made in contemplation of death if made within two years thereof. The decision was based largely on two former Supreme Court decisions, Schlesinger v. State of Wisconsin, 270 U.S. 230, 46 S.Ct. 260, 261, 70 L.Ed. 557, and Hoeper v. Tax Commission, 284 U.S. 206, 52 S.Ct. 120, 76 L.Ed. 248. The court held, [285 U.S. 312, 52 S.Ct. 360] among other things, that it made no difference whether the question arose under the Fourteenth Amendment or the Fifth Amendment, and that the fundamental vice in the statute was that it "made it conclusive without regard to actualities"; that the concept that one person shall be required to submit to an unconstitutional exactment, if this seems necessary in order to enable the Government readily to collect lawful charges from another person, is wrong because "Rights guaranteed by the federal Constitution are not to be so lightly treated; they are superior to this supposed necessity".

Similar language used by the court in Heiner v. Donnan constitutes a sufficient answer to much of the argument made by the Government here to the effect that Congress was engaged in an effort to strengthen the hands of those enforcing the Agricultural Adjustment Act by providing machinery by which penalties

---

29. 12 Am.Jur.Constitutional Law, Sec. 625, pp. 317–8.

30. United States v. Provident Trust Co., 291 U.S. 272, 281–282, 54 S.Ct. 389, 78 L.Ed. 793.

31. Section 302(c) of the Revenue Act of 1926, c. 27, 44 Stat. 9, 70 (U.S.C. Title 26, Sec. 1094) containing these words: "* * * Where within two years prior to his death * * * the decedent has made a transfer * * * of any of his property * * * such transfer or transfers *shall be deemed and held* to have been made in contemplation of death within the meaning of this title."

might be more easily applied [285 U.S. 312, 52 S.Ct. 362]:

"To sustain the validity of this irrebuttable presumption, it is argued, with apparent conviction, that under the *prima facie* presumption originally in force there had been a loss of revenue, and decisions holding that particular gifts were not made in contemplation of death are cited. This is very near to saying that the individual, innocent of evasion, may be stripped of his constitutional rights in order to further a more thorough enforcement of the tax against the guilty, a new and startling doctrine, condemned by its mere statement, and distinctly repudiated by this court in the Schlesinger (270 U.S. 240, 46 S.Ct. 260, 70 L.Ed. 557) and Hoeper (284 U.S. 217, 52 S.Ct. 120, 76 L.Ed. 248) cases involving similar situations. Both emphatically declared that such rights were superior to this supposed necessity."

The court there also held categorically that the statute was not saved by calling it a rule of substantive law, 285 U.S. at page 329, 52 S.Ct. at page 362: " * * * However, whether the latter presumption be treated as a rule of evidence or of substantive law, it constitutes an attempt, by legislative fiat, to enact into existence a fact which here does not, and cannot be made to, exist in actuality, and the result is the same * * *. If a legislative body is without power to enact as a rule of evidence a statute denying a litigant the right to prove the facts of his case, certainly the power cannot be made to emerge by putting the enactment in the guise of a rule of substantive law."

The majority opinion seems to sense that its holding is out of step with Heiner v. Donnan since it calls to its aid [32] the dissenting opinion of Mr. Justice Stone and the authorities cited in the dissent. In any event, the case does condemn conclusive presumptions, whether construed as rules of evidence or rules of substantive law. And we are referred to no Supreme Court case upholding such a presumption.

The effort is made in a series of annotations [33] to distill from the cases a set of principles by which the constitutionality of statutes creating presumptions may be decided. The foreword to the note last mentioned contains this summary: "In accordance with this treatment the following later cases have been collected as supporting the rule that statutes which declare one fact conclusive evidence of another material fact in controversy are unconstitutional if the former is not, in and of itself, by virtue of its own force, conclusive."

All efforts at formulating a statement of general principles have been qualified by remarks to the effect that it is next to impossible so to do. In speaking of such an effort Mr. Justice Cardozo used this language: "The decisive considerations are too variable, too much distinctions of degree, too dependent in last analysis upon a common sense estimate of fairness or of facilities of proof, to be crowded into a formula. One can do no more than adumbrate them; sharper definition must await the specific case as it arises." [34]

A reading of the cases fails to disclose any instance in which a conclusive presumption has been permitted to rest on a relationship between the fact proved and

32. Note 5, Majority opinion.

33. 51 A.L.R. 1139, 1149; 86 A.L.R. 179, 182; 162 A.L.R. 495, 516, and see the following Law Journal Articles: Brosman, "The Statutory Presumption", 5 Tulane L. Review 178; Keeton, "Statutory Presumptions—Their Constitutionality and Legal Effect", 10 Texas L.Rev. 34; "Constitutionality of Statutory Presumptions", 46 Harvard L.Rev. 1324; and Hale, "Necessity of Logical Infer-

ence to Support a Presumption", 17 So. Cal.L.Rev. 48.

34. Morrison v. People of State of California, 291 U.S. 82, 91, 54 S.Ct. 281, 285, 78 L.Ed. 664, and see for illustrations of similar statements McFarland v. American Sugar Refining Co., 241 U.S. 79, 86, 36 S.Ct. 498, 60 L.Ed. 899 (both of these cases involved rebuttable presumptions).

the fact presumed which shows no more rational connection than here. The fact which the majority counts as absolutely established is that appellant marketed certain peanuts (which the proof shows without dispute he did not market or ever intend to market); the fact proven was that appellant failed to answer a letter. The Supreme Court has never sustained even a rebuttable presumption resting on so tenuous a connection as that.

The burden of the Government's argument, which the majority evidently found sound, is that it is difficult, and requires the employment of too many operatives, to prove what a man has done with the peanuts he has harvested. The Supreme Court answered that argument in a decision striking down an act of Congress creating a rebuttable presumption:[35] "It is not too much to say that the presumptions created by the law are violent, and inconsistent with any argument drawn from experience. Nor can the fact that the defendant has the better means of information, standing alone, justify the creation of such a presumption. * * * It would, therefore, be a convenience to the Government to rely upon the presumption and cast on the defendants the burden of coming forward with evidence to rebut it. But, as we have shown, it is not permissible thus to shift the burden by arbitrarily making one fact, which has no relevance to the guilt of the offense, the occasion of casting on the defendant the obligation of exculpation."[36]

It is clear from the above that the Supreme Court has stricken down even rebuttable presumptions with near unanimity and that nothing it has done or said is hospitable to the thought that this statute would be upheld if construed to establish a conclusive presumption. In order to rescue it from the stigma of unconstitutionality, therefore, it is necessary to avoid the harsher construction advocated by the Government and now adopted by the majority.

Appellant further contends that the statutes and regulations requiring him to make a written report are unconstitutional because they do not meet the requirements of due process of law. He further claims that to require him to make the reports demanded of him is to force him to give testimony against himself in violation of the Fourth Amendment. To the latter contention the Government responds that an exception is made with respect to those records which the law requires to be kept. But the law does not require a farmer to keep records. The only statute purporting to deal with this feature is 7 U.S.C.A. § 1373, which requires warehousemen, processors, common carriers, brokers and others handling the commodities covered by the Act to keep records and makes it a misdemeanor to fail to do so. Nowhere does the Act mention that

---

35. Tot v. United States, 319 U.S. 463, 468–469, 63 S.Ct. 1241, 1245, 87 L.Ed. 1519.

36. The Government further argues that Congress had the right to require records to be kept and to penalize failure to keep them. Assuming this to be true, there must still be some logical and rational connection between the penalty and the failure to keep records. For instance, Section 1373(a) of the Act does require warehousemen, processors, brokers and others dealing with peanuts and other commodities to keep certain records and to make certain reports, and makes violation of the statute a misdemeanor. Subparagraph (b) of the same section requires farmers to make reports, but not to keep any records.

It is worthy of note also that the only provision of the Act, § 1373(b), purporting to deal with reporting applies only to *farmers producing for market;* "Farmers engaged in the production of * * * *peanuts* * * * *for market* shall furnish such proof of their acreage, yield, storage, and marketing * *". The words of the Act do not apply to appellant who was not producing for market.

Moreover, assuming that Congress could have provided in Section (b) a penalty similar to that in Section (a), it did not do so and it could not establish a penalty having no rational relationship with the failure to make reports, such as the establishment of a presumption of marketing peanuts which were, in fact, not marketed.

farmers or producers are required to keep any record.

Subdivision (b) of Section 1373 does require that, "Farmers * * * shall furnish such proof of their acreage, yield, storage, and marketing * * *". This language does not bring such reports under the exception which exempts from the application of the Fourth Amendment records required to be kept.

Moreover, the provisions of the statutes requiring reports to be made do not provide any means of appeal or review, and do not permit access to the courts. Section 1373(b) requires the reports to be made and the Secretary has issued regulations [37] requiring that a farmer make the report demanded of him within fifteen days after receiving a registered letter from the State Production and Marketing Administration Committee. Failure to answer such a letter caused the infliction of the penalties recovered against appellant under the conclusive presumption sanctioned by this court. The constitutional infirmity of this procedure lies in the fact that the State Committee has the final say with respect to all of the requirements for reporting. With respect to the other features of the Act, such as acreage allotments, the establishment of quotas and the like, an elaborate scheme of reviews and appeals is provided. Section 1362 of Title 7 provides for mailing of notices to the farmer, Section 1363 provides for review by a disinterested review committee, and Sections 1365, 1367 set up a detailed arrangement for review in the courts of the actions of these two committees, including the right to adduce additional evidence.

But none of these salutary provisions apply to the heavy penalties which follow failure to respond to the Committee's letter. That letter demanded that appellant disclose the total production of peanuts, and that appellant could not do because he harvested and used the peanuts himself and did not weigh them or otherwise ascertain the amount produced.

The right of review and access to the courts, of notice and opportunity to be heard are minimal requirements of proceedings by administrative bodies and procedures which do not afford those rudiments of fair play have been universally stricken down.[38]

## V.

(a) Appellant contends that the Agricultural Adjustment Act, insofar as it relates to peanuts, applies solely to those producing for market and not to those producing for home consumption. The language of the statutes gives substance to that contention.

The sole requirements for the making of reports is contained in 7 U.S.C.A. § 1373(b) and reads as follows:

### Proof of Acreage Yield

"(b) *Farmers engaged in the production* of corn, wheat, cotton, rice, peanuts, or tobacco *for market shall furnish such proof* of their acreage, yield, storage, and marketing of the commodity in the form of records, marketing cards, reports, storage under seal, or otherwise as the Secretary may prescribe as necessary for the administration of section 1301–1393 of this title."

This section applies alone to *farmers producing for market* and it is undisputed that appellant was not producing for market, and there is no provision in the entire law requiring him to make reports.

(b) The same is true of the remaining provisions of the Act essaying to regulate the growing of peanuts. While the

37. 729.161(b), 15 F.R. 4743 and 729.261 (b), 16 F.R. 5673.

38. See State of Washington ex rel. Oregon R. & Nav. Co. v. Fairchild, 224 U.S. 510, 32 S.Ct. 535, 56 L.Ed. 863; State of Missouri ex rel. Hurwitz v. North, 271 U. S. 40, 46 S.Ct. 384, 70 L.Ed. 818; St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033, and Ohio Bell Telephone Co. v. Public Utilities Comm. of Ohio, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093, as examples.

language of the Act shows that it was the purpose of Congress to control the *production* of corn, wheat and cotton, it shows equally clearly that it intended to control only the *marketing* of peanuts.

For example, Congress made legislative findings with respect to wheat, 7 U.S.C.A. § 1331, that it "is a basic source of food for the Nation * * * [that] abnormally excessive supplies overtax the facilities of interstate and foreign transportation, * * * and otherwise disrupt the orderly marketing of such commodity. * * * [And that] conditions affecting the *production* and marketing [make necessary] a cooperative plan for wheat producers". A like finding is made by Congress with respect to corn, Section 1321, and cotton, Section 1341, and the clear import of those findings (which establish a rational basis for the difference in treatment) is that mere *production* of those commodities tends to burden interstate commerce. Based upon this expressed legislative intent, the Supreme Court held, in Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122, that production for consumption came under the control of the Act.

The legislative findings forming the basis for legislative action with respect to peanuts, Section 1357, contains no such words, but concludes that "It is imperative that the *marketing* of peanuts for cleaning and shelling and for crushing for oil in interstate and foreign commerce be regulated * * *." The distinction persists when Congress set about to define "market";[39] and in the penalty provisions for corn, Section 1325, wheat, Section 1339, cotton, Section 1346, and rice, Section 1356, which provide explicitly for penalizing *over-production*, while the penalty provisions covering peanuts, Section 1359, penalized marketing alone.[40] This showing points unerringly to the conclusion that neither the Secretary nor the Committee had any statutory right to call upon appellant to make any reports or to inflict any penalties upon him for failing to respond to the written request.

The importance of the foregoing is manifest because the only right Congress had to enact the Agricultural Adjustment Act is derived from the Commerce Clause. Congress made a finding of fact, that the *production* of wheat, corn and cotton burdened interstate commerce, but it did not make that finding with respect to peanuts. It found only that the *marketing* of peanuts burdened interstate commerce. The absence of such a finding destroys the sole basis of the right of Congress to legislate on the subject at all.

### VI.

(a) It is clear, therefore, that the indisposition of courts to enlarge beyond their clear expressions the penalty provisions of a statute; the inclination to bring into harmony and parity all of the cognate terms of a legislative enactment; the marked reluctance of the Supreme Court to sustain against attack on constitutional grounds even rebuttable presumptions, and the complete absence of action or words on its part in favor of a conclusive presumption, all admonish us to refrain from ascribing to the language in question the arbitrary aspect contended for by the Government. It is

39. Section 1301, Subdivisions (6) (A) and (C):

(6) (A). "Market, in the case of corn, cotton, rice, tobacco, and wheat, means to dispose of, in raw or processed form, by voluntary or involuntary sale, barter, or exchange, or by gift *inter vivos*, and, in the case of corn, and wheat, *by feeding* (in any form) *to poultry or livestock* * * *."

(6) (C). "Market, in the case of peanuts, means to dispose of peanuts, including farmers' stock peanuts, shelled peanuts, clean peanuts, or peanuts in processed form, *by voluntary or involuntary sale, barter, or exchange, or by gift inter vivos.*"

40. Section 1359, titled "Marketing Penalties" provides in Section (a):

"The *marketing* of any peanuts in excess of the marketing quota for the farm on which such peanuts are produced, or the *marketing* of peanuts from any farm for which no acreage allotment was determined, shall be subject to a penalty * * *."

our clear duty, under my view, to construe the word, deem, as used in this statute as having the meaning given it by the average man, the equivalent of such words as regard, or consider, or presume; and to hold that, at most, the statute before us creates a rebuttable presumption.[41]

But the majority was not persuaded by such considerations. It finds the problem a simple one,[42]—made so by the simple expedient of substituting words of its own selection in place of the words used by Congress. The result reached sets the peanut farmer apart for special harsh treatment. It is not sufficient to asseverate that Congress possibly had the right to discriminate against one farmer and in favor another. It is sufficient to say that Congress did not do so unless words are to be inserted into its enactments by such strained construction as that adopted by the majority.

(b) The decision of the majority, moreover, is out of step with the attitude courts have demonstrated ever since supposed necessity has given rise to the recent vast enlargement of governmental powers in connection with the intimate details of the lives of the citizens. The courts have been unanimous in the determination that, in the process, the constitutional rights of the individual citizen should be jealously safeguarded. For example, the Supreme Court twice reversed actions of the Secretary of Agriculture taken in connection with a cog-

nate statute[43] for the reason that he had not observed the rudiments of fair play such as notice and opportunity to be heard in hearings conducted by him for the fixing of maximum stockyard weights. The language the court used there expresses the general attitude of the courts on the subject:

"The vast expansion of this field of administrative regulation in response to the pressure of social needs is made possible under our system by adherence to the basic principles that the Legislature shall appropriately determine the standards of administrative action and that in administrative proceedings of a quasijudicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play. These demand 'a fair and open hearing,' essential alike to the legal validity of the administrative regulation and to the maintenance of public confidence in the value and soundness of this important governmental process. Such a hearing has been described as an 'inexorable safeguard'. * * *

"For, as we said at the outset, if these multiplying agencies *deemed* to be necessary in our complex society are to serve the purposes for which they are created and endowed with vast powers, they must accredit themselves by acting in ac-

41. This conclusion is buttressed by a consideration of the language used by Congress in the presumption set forth in the Revenue Act construed in Heiner v. Donnan, supra [285 U.S. 312, 52 S.Ct. 359]: " 'Such transfer or transfers shall be deemed and *held* to have been made in contemplation of death * * *' ". It is accepted that Congress was there engaged in creating a conclusive presumption because the Supreme Court struck it down on that ground. The word, deem, was manifestly not considered by Congress to be adequate standing alone to create a conclusive presumption. On the other hand, Congress recognized that it was compelled to use a stronger word if it would express the idea of conclusive-

ness, and it chose the word "held", which means to decide, to adjudge, to decree. The precedent thus set by Congress is a safe guide and ought to point the way to the action which we should take here.

42. The Government did not consider the problem simple. Its brief [one accustomed to litigation with the Government normally expects to receive a brief of a dozen pages] of sixty-eight pages, plus seven pages of index and authorities, cites 153 cases, 41 separate sections of the Constitution and statutes, and a page and a half of miscellaneous Government publications.

43. Packers and Stockyards Act, 1921, 7 U.S.C.A. § 181 et seq.

cordance with the cherished judicial tradition embodying the basic concepts of fair play." [44]

## VII.

(a) The bold stand taken by the Government is thus epitomized in its brief: "The statutory penalties are applicable because the appellant failed, within the period of time allowed, to submit the required report to the administrative committee with respect to the disposition of the peanuts. To borrow an expression from Judge Learned Hand, if the 'whole House of Bishops' * * * now testified that the appellant fed the peanuts to his cattle and hogs, nonetheless the applicant would be liable for civil penalties because he failed, within the time allowed, to submit the required report or accounting to the Administrative Committee with respect to the disposition of the peanuts".

Here, indeed, is the sublimation of the bureaucracy-concept now implemented by a decision which constitutes the farthest out-reach of any case cited or discovered. Appellant may not plant a row of goobers that his family may munch them around the fire of a winter night unless he has obtained the permission of some government functionary. And (unlike his neighbors who plant corn, wheat, rice, etc.) he is denied access to the courts that he may exonerate himself, because the law has discovered a fiction which invests a word with such magic that, in advance, it deems "Truth to be a liar". That concept contemplates the complete subservience to the System of the individual liberties of the citizens and forgets that the wisdom of the ages has declared this freedom to be the genius and the glory of the American way of life.

If we would maintain our sense of proportion we ought to pause and ponder the oft-quoted words of Mr. Justice Brandeis: [45] "The protection guaranteed by the amendments is much broader in scope. The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment. * * *

" * * * Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding. * * *"

(b) Perhaps appellant—and those like him who are willing to bet their substance on the eventual triumph of those principles—can get consolation, when tempted to consider truth as "forever on the scaffold", by recalling that, " * * * that scaffold sways the future". Doubtless, too, he will find comfort in the assurance that

"Truth, crushed to earth will rise again:

Th' eternal years of God are hers;
But error, wounded, writhes in pain,
And dies among his worshipers."

Rehearing denied; CAMERON, Circuit Judge, dissenting.

44. Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288; Id., 304 U.S. 1, 14–15, and 22, 58 S.Ct. 773, 775, 999, 82 L.Ed. 1129.

45. His dissent in Olmstead v. United States, 277 U.S. 438, 478–479, 48 S.Ct. 564, 572, 72 L.Ed. 944, from which we quoted in Brock v. United States, 5 Cir., 1955, 223 F.2d 681, 685.